981 P.2d 796

STATE of New Mexico,
Plaintiff–Appellee,

v.

Gilbert DICK, Defendant–Appellant.

No. 18969.

Court of Appeals of New Mexico.

March 18, 1999.

Certiorari Granted, No. 25,691,
May 7, 1999.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Ass't Attorney General, Santa Fe, for appellee.

Phyllis H. Subin, Chief Public Defender, Laurel A. Knowles, Ass't Appellate Defender, Santa Fe, for appellant.

Herb Yazzie, Navajo Nation Attorney General, Marcelino R. Gomez, Ass't Attorney General, Window Rock, AZ, for amicus curiae.

*OPINION*

PICKARD, Chief Judge.

{1} Defendant was arrested in McKinley County, and charged in state court, for driv-

ing while under the influence of intoxicating liquor (DWI). He filed a motion to dismiss that challenged the jurisdiction of the McKinley County District Court, arguing that the arrest occurred in "Indian country" and as a result fell outside the state court's jurisdiction. The district court denied Defendant's motion to dismiss, and Defendant now appeals that denial. In light of the United States Supreme Court's recent discussion of this issue in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), we reverse.

## FACTUAL AND PROCEDURAL BACK-GROUND

{2} Defendant, a member of the Navajo Nation, was arrested for DWI near the intersection of State Road 118 and State Road 400 in McKinley County, New Mexico. State Road 118 is the former Route 66, which runs north of and nearly parallel to Interstate 40. State Road 400 runs north-south through Fort Wingate. Defendant was charged in McKinley County District Court, where he challenged that court's subject matter jurisdiction. Because this jurisdictional issue was common to six known defendants, a unified hearing concerning state jurisdiction on this land, Fort Wingate, was held. This appeal, however, concerns only Defendant Dick.

{3} "Fort Wingate" refers to a tract of 100 square miles designated in 1870, and an additional 30 square miles designated in 1881, as a military reservation. In 1950, Congress enacted a public law retaining title to 13,150 acres of Fort Wingate in the United States, but transferring the land to the Department of the Interior for the use of the Bureau of Indian Affairs (BIA). *See* Public Law 567, 64 Stat. 248 (1950) (Public Law 567). The Fort Wingate area remains titled in the United States government, with the exception of sixteen acres that are privately owned (the Merrill Property).

{4} The United States government's holdings in Fort Wingate are now four separately administered parcels, as indicated on the following representational map.

Parcel one, to the north, is administered by the BIA in trust for the Navajo Nation. Parcel two, south of parcel one and west of parcels three and four, is administered by the United States Department of Defense. Parcel three, south of parcel one and east of parcel two, is administered by the BIA. Parcel four is directly south of parcel three, and is administered by the United States Forest-ry Service. Defendant was arrested on parcel three.

{5} The district court viewed parcels two, three, and four as the proper community of reference on which to base the determination of whether Fort Wingate is properly considered a "dependent Indian community" under 18 U.S.C. § 1151(b) (1994). The district

court went on to apply the four-factor test set forth in *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1545 (10th Cir.1995), for assessing whether Fort Wingate is a "dependent Indian community." The district court found that parcel three housed a high school and an elementary school, that the high school's student body was 90% Navajo, the remainder being from other Indian tribes, and that about 75% of the students lived on campus. The district court concluded that "[p]arcel 3 is land held by the BIA for purposes of primarily educating Indian children, but not specifically for the use, occupancy and protection of dependent Indian peoples."

{6} Based on the evidence presented at the hearing, the district court denied Defendant's motion to dismiss. Defendant entered a guilty plea to the charge of second-offense DWI, reserving his right to appeal the denial of his motion to dismiss.

## DISCUSSION

### A. *Standard of Review*

{7} Upon review, this Court will defer to the trial court's determinations of fact if such findings are supported by substantial evidence. *See State v. Munoz*, 111 N.M. 118, 120, 802 P.2d 23, 25 (Ct.App.1990). As to matters of law, this Court conducts a de novo review. *See State v. Frank*, 1997–NMCA–093, ¶ 4, 123 N.M. 734, 945 P.2d 464.

### B. *"Indian Country"*

█ {8} Defendant contends that because he was stopped in "Indian country," the state had no jurisdiction over him. As a general principle, a state has no jurisdiction over crimes committed by an Indian in "Indian country." *See generally United States v. Kagama*, 118 U.S. 375, 383, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *cf. Williams v. United States*, 327 U.S. 711, 714, 66 S.Ct. 778, 90 L.Ed. 962 (1946) (holding that a state has no jurisdiction over a crime committed by a non-Indian against an Indian in "Indian country").

{9} Congress defines "Indian country" at 18 U.S.C. § 1151. That provision states:

"Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

In this appeal, however, only the second form of "Indian country," that is, "dependent Indian communities," is at issue.

### 1. *"Dependent Indian Community"*

{10} The United States Supreme Court recently revisited the question of what is a "dependent Indian community" in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). In *Venetie*, the Court stated that the determination of whether a given community is a "dependent Indian community" under Section 1151(b) turns on two elements: (1) a federal set-aside of lands for Indian use; and (2) federal superintendence of such lands. *See id.* at ——, 118 S.Ct. at 953. Compared to existing precedent in the circuits, the *Venetie* opinion indicates a change in the focus of the "dependent Indian community" analysis by shifting the emphasis from the inhabitants and their day-to-day relationship with the government to a land-based inquiry. *See id.* at —— – —— n. 5, 118 S.Ct. at 954–55 n. 5.

{11} Prior to *Venetie*, the test for determining whether a "dependent Indian community" existed varied by jurisdiction. Here in New Mexico, we decided this issue most recently in *State v. Frank*, In *Frank*, we adopted the Tenth Circuit's analysis in *Watchman*. *See Frank*, 1997–NMCA–093, ¶¶ 6, 13, 123 N.M. 734, 945 P.2d 464. In *Watchman*, the Tenth Circuit required an initial determination of the community of reference and a four-prong test to be applied to the designated community of reference to determine whether that community is a "dependent Indian community." *See Watch-*

*man,* 52 F.3d at 1545. The four prongs are: (1) whether the United States has retained title to the lands which it permits the Indians to occupy and authority to enact regulations and laws governing the property; (2) the nature of the area in question, the relationship of its inhabitants to Indian tribes and the federal government, and the practice of the government toward the area; (3) whether there is an element of cohesiveness in the area; and (4) whether the lands have been set apart for the use, occupancy, and protection of dependent Indian peoples. *See Frank,* 1997–NMCA–093, ¶ 13, 123 N.M. 734, 945 P.2d 464.

{12} The Supreme Court in *Venetie* disapproved of the multi-factored tests for "dependent Indian communities" as it rejected the Ninth Circuit's six-factored "textured" analysis. *See id.* at —— n. 7, 118 S.Ct. at 955 n. 7. The six factors referred to by the Ninth Circuit are the same as the four factors from *Watchman,* except that compound factors in *Watchman* are separated out into individual factors. *See Venetie,* 522 U.S. at ——, 118 S.Ct. at 952. While the Supreme Court did not eliminate the other factors outright, it did declare that the federal set-aside and superintendence considerations take priority over other considerations. *See id.* at —— – —— & n. 7, 118 S.Ct. at 954–55 & n. 7. The Court criticized the Ninth Circuit's relegation of "the federal set-aside and superintendence requirements to mere considerations." *Id.* at —— n. 7, 118 S.Ct. at 955 n. 7. The Court explained the relationship between the *Venetie* analysis and the articulations of the different Circuit Courts of Appeal:

> The federal set-aside requirement ensures that the land in question is occupied by an "Indian community"; the federal superintendence requirement guarantees that the Indian community is sufficiently "dependent" on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question.

*Id.* at ——, 118 S.Ct. at 955 (footnotes omitted).

{13} In our case, the trial court concluded, in its application of the *Watchman* analysis, that the relevant community of reference in this case consisted of parcels two, three, and four of Fort Wingate. The district court offered no support for its exclusion of parcel one, which it found to be Indian trust land, or its inclusion of parcels two and four, which are used for military and national forest purposes, respectively. As stated above, we review this legal conclusion de novo.

{14} The first prong of *Venetie,* federal set-aside, seems to obviate, to some extent, the need for defining the relevant community. By congressional enactment, approximately 13,150 acres of Fort Wingate, of which there is no dispute that parcel three is a part, were set aside "for the use of the Bureau of Indian Affairs." *See* Public Law 567. The title of Public Law 567 states that it is "An Act [t]o make available for Indian use certain surplus property." According to *Venetie,* this express set-aside ensures that the land is occupied by an Indian community. *See id.* at ——, 118 S.Ct. at 955.

{15} Even if this were not the case, the same result would obtain if we utilized the "community of reference" concept of *Frank* to assist in making this determination. *See Frank,* 1997–NMCA–093, ¶¶ 9–10, 123 N.M. 734, 945 P.2d 464. The overarching concern in determining the appropriate community is the element of cohesiveness. *See id.* ¶ 10. This can be evaluated by looking to the common interests as well as the infrastructure of an area. *See id.* Also, we acknowledged in *Frank* the geographical definition of an area as a factor in separating out a community. *See id.* ¶ 11. In light of these factors, parcel three, the BIA school community, stands out as the relevant community. Defendant was stopped on a road in parcel three. Parcel three, as shown by the record, is administered by the BIA for the primary purpose of educating Indian children. In fact, it is an educational community where, primarily, Indian students board and some faculty live. Given the different uses of parcels two and four, we hold that the trial court erred in including lands that serve unrelated purposes as a part of the relevant "community." It is parcel three that serves as the basis for our decision.

### a. *Federal Set–Aside*

■ {16} The district court made no specific finding of whether or not the land in question was "set aside" for Indian use. The district court found that "[p]arcel 3 was administratively assigned to the BIA in 1950 for school purposes" and that "there is no trust language in the administrative assignment directing the BIA to hold the land for use, occupancy or protection of any Indian tribe." However, all that is required under the first prong of the *Venetie* test is that the land be "set aside" by the federal government for Indian use. *See Venetie*, 522 U.S. at ——, 118 S.Ct. at 953. Public Law 567 did, in fact, set aside the land "for use by the Bureau of Indian Affairs." Although specific trust language is not used in the Act, it need not be. The statement that "Title to the land so transferred shall remain in the United States for the use of the Bureau of Indian Affairs" is sufficient to satisfy *Venetie's* federal set-aside requirement.

■ {17} The status of the land as housing a school community does not remove it from the set-aside requirements set out in *Venetie*. Rather, "[t]he federal set-aside requirement ensures that the land in question is occupied by an 'Indian community.' " *Venetie*, 522 U.S. at ——, 118 S.Ct. at 955. The use of land for schooling of an Indian community appears to be a "use" consistent with the set-aside requirement.

{18} The Oklahoma Court of Criminal Appeals has held that a similar land area, used and administered by the BIA for Indian schools, met the requirement that the land be "validly set apart for the use of Indians as such, under the superintendence of the government" when an executive order "set aside [the land] for the settlement of such friendly Indians … as have been or who may hereafter be educated at the Chilocco Indian Industrial School" and when Congress ratified an agreement between the Cherokee Nation and the United States stating the lands were reserved "for use of and in connection with the Chilocco Indian Industrial School," as well as for the purposes set forth in the executive order. *C.M.G. v. Oklahoma*, 594 P.2d 798, 800, 801, 802 (Okla.Crim.App.1979).

{19} In *C.M.G.*, the circumstances were similar to those facing us in the instant case. All students enrolled at the BIA schools were at least one-quarter Indian and from various tribes, although non-Indians were permitted to attend. *See id.* at 799–800. The vast majority of the school's employees were Indian, and some were housed at the school. *See id.* at 799. The school property was owned by the United States government. *See id.* at 800–01. The court in *C.M.G.* found that the land had been set aside by executive order and was federally superintended. *See id.* at 803, 804. Although the Oklahoma court was applying a different iteration of the test we apply here, it found that an analogous set-aside requirement was integral to that test. The land in that case had been "reserved by Congress for an Indian school and for the 'settlement of such friendly Indians … as have been or may hereafter be educated at the Chilocco Indian Industrial School.' " *Id.* at 803. The court held that the land had been set apart for Indian use. *See id.* at 802.

{20} The State also contends that the Indian country precedent requires that qualifying land must be set aside for an Indian residential community or settlement, and that because parcel three was not so set aside, it fails the *Venetie* analysis. At oral argument before this Court, the State relied on an interpretation of wording from *United States v. Pelican*, 232 U.S. 442, 449, 34 S.Ct. 396, 58 L.Ed. 676 (1914), that is cited in *Venetie*. The *Venetie* Court noted "[w]e stated that the original reservation was Indian country 'simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government.' " *Venetie*, 522 U.S. at ——, 118 S.Ct. at 953, (quoting *Pelican*, 232 U.S. at 449, 34 S.Ct. at 399) (emphasis omitted). Under the State's proposed analysis, "as such" refers to land set aside for occupation and residence by Indians and does not encompass parcel three.

{21} We disagree with the State's theory. Although the cases relied upon by *Venetie* and *Venetie* itself address lands that were allotments, villages, reservations, or otherwise home to Indians, there is no indication that the set-aside requirement is so limited. Rather, the "as such" language permits two

reasonable interpretations. First, it may require only that the land be set aside for the use of the Indians as Indians. *See id.* at ——, 118 S.Ct. at 954; *see also United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410 (1938) (quoting *Pelican,* 232 U.S. at 449, 34 S.Ct. 396). We interpret this as being set aside for Indian use.

{22} Alternatively, as the State argues, the meaning of the "as such" phrase in *Pelican* can be interpreted to mean use of the land as a reservation or for residence by Indians. We are, however, not persuaded and conclude that the first alternative applies. As noted in *Venetie,* in *McGowan,* the Supreme Court held land to be Indian country even though it was not a reservation because it had been set apart for Indian use and benefit. *See Venetie,* 522 U.S. at —— – ——, 118 S.Ct. at 953–54. In *Pelican,* the land had been a reservation and was later broken up into various parcels of land. The Court could not have meant that land had to be set-aside as reservation-type land. Otherwise, there would have been no need for the passage of Section 1151, which separately discusses reservations, allotments, and dependent Indian communities. Because "[t]he federal set-aside requirement ensures that the land in question is occupied by an 'Indian community,'" *Venetie,* 522 U.S. at ——, 118 S.Ct. at 955, the State's semantic argument is misplaced.

{23} Even were we to subscribe to the State's theory, however, the BIA schools and housing on parcel three do, in fact, comprise a "community." As the district court found, the property houses a high school and an elementary school primarily for the education of Indian children. The occupancy of parcel three is controlled and regulated by the BIA, and all housing is for the use and occupancy of students, school employees, and employees' families. Occupancy of campus housing is entirely conditioned on a relationship with the schools. The high school population is 100% Indian, and about 75% of the students from the schools board on campus. Fifty-five percent of the employees living on campus are Indian. This population, and the occupants of the Merrill property, are the sole occupants of parcel three. Even if a residential community of some sort were required, the BIA schools on parcel three would constitute such a community.

### b. Federal Superintendence

■ {24} The *Venetie* analysis also requires that the land be subject to federal superintendence. *See Venetie,* 522 U.S. at —— – ——, 118 S.Ct. at 954–55. The district court made findings to support a holding that this requirement was met. For example, the district court found the land to be "controlled by the U.S. Department of Interior, Bureau of Indian Affairs." Also, the district court found that "[a]ll occupancy on Parcel 3, except on the Merrill Property, is controlled and regulated by the BIA without participation by any Indian tribe and tribal government." The court concluded that "[i]f the educational or employment relationship of a Parcel 3 occupant with the schools is terminated, occupancy must cease forthwith except on the lands comprising the Merrill Property," and found that "[g]razing animals in Parcel 3 are regulated by the BIA and branded with BIA brands." All of these findings indicate that the BIA, a federal agency, has control over the land at issue.

■ {25} The fact that sixteen acres of parcel three were private land does not defeat the finding of a set-aside or federal superintendence in this case. Defendant was not arrested on the private Merrill property. In addition, we have held that privately held land can constitute "Indian country" when it is within the boundaries of land that is properly considered "Indian country." *See State v. Ortiz,* 105 N.M. 308, 312, 731 P.2d 1352, 1356 (Ct.App.1986).

■ {26} The State further relies on the fact that emergency fire, police, and medical services and utilities for parcel three are predominantly provided by the state. However, this alone does not change the analysis. As in *Venetie,* where the Supreme Court held that the provision of services by federal entities did not render the land a dependent community, here the provision of services by the state does not defeat a finding of a dependent Indian community. *See Venetie,* 522 U.S. at ——, 118 S.Ct. at 956. The circumstances of parcel three are such that

the federal superintendence requirement was met.

{27} The status of parcel three as a "dependent Indian community" is consistent with the ultimate consideration that federal authorities and the Indians themselves should exercise primary jurisdiction over the land. *See Venetie*, 522 U.S. at ——, 118 S.Ct. at 955. The commonality among the members of the parcel three's BIA school community is such that the state should not have jurisdiction over Indians committing crimes on that land.

## CONCLUSION

{28} The area in question in this case, parcel three of the former Fort Wingate Military Reservation, meets the two-pronged test for a "dependent Indian community" set out by the United States Supreme Court in *Venetie*. Therefore, the State did not have jurisdiction to prosecute the case against Defendant, who was stopped and arrested for DWI on that parcel. We reverse and remand with instructions to dismiss the charges.

{29} **IT IS SO ORDERED.**

BUSTAMANTE and ARMIJO, JJ., concur.