**UNITED STATES of America,
Plaintiff,**

v.

**M.C. (a juvenile), Defendant.**

**No. CR–02–219MV.**

United States District Court,
D. New Mexico.

March 24, 2004.

Jonathan Gerson, Assistant U.S. Attorney, District of NM, Albuquerque, NM, for Plaintiff.

Benjamin Gonzales, Assistant Federal Public Defender, District of NM, Albuquerque, NM, for Defendant.

Marcelino Gomez, Esq. and Donovan Brown, Esq., Navajo Nation Dept of Justice, Window Rock, AZ, for Navajo Nation.

Peter Tasso, Esq., Albuquerque, NM, for Zuni Tribe.

Arthur W, Pepin, Esq., NM Attorney General's Office, Santa Fe, NM, for State of New Mexico.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, Chief Judge.

**THIS MATTER** comes before the Court on Defendant M.C.'s Motion to Dismiss Indictment for Lack of Jurisdiction, filed May 14, 2002. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**.

### BACKGROUND

The indictment charges Defendant, a juvenile, with second degree murder in violation of 18 U.S.C. § 5031, *et seq.*, § 1153 and § 1111. The alleged offense occurred at the Fort Wingate Indian School (the "School") in McKinley County, New Mexico. "Fort Wingate" is a tract of 100 square miles designated in 1870, and an additional 30 square miles designated in 1881, as a military reservation. In 1950, Congress enacted Public Law 567 transferring to the Department of the Interior, for use by the Bureau of Indian Affairs ("BIA"), 13,150 acres of the Fort Wingate Military Reservation determined to be surplus to the requirements of the Department of the Army. Title to the transferred land was to remain in the United States for the use of the BIA. Currently, the Fort Wingate area remains titled in the federal government, with the exception of sixteen privately owned acres of land.

The federal government's holdings in Fort Wingate are now four separately administered parcels. The School, along with Wingate Elementary School, is located on Parcel Three. To the north of Parcel Three is Parcel One, which is administered by the BIA in trust for the Navajo Nation. This area is referred to as the Iyanbito. Parcel Two, south of Parcel One and west of Parcel Three, is administered by the Department of Defense. Parcel Four is south of Parcel Three and is administered by the United States Forestry Service.

In 1990, after a determination that sixteen acres of Parcel Three were excess to the needs of the BIA, the government sold those sixteen acres to an individual named Paul Merrill. The privately owned Merrill Property is the "commercial hub" of the area, containing a small restaurant, a gas station, a trailer park, a United States Post Office and rental apartments. With the exception of the Paul Merrill Property, Parcel Three continues to be administered by the BIA. The BIA is responsible for and has authority over all land use within

the boundaries of Parcel Three, including the issuance of permits and easements and the determination of whether land is excess to its needs. No tribal government has the authority to determine the use, occupancy or transfer of any part of the land on Parcel Three.

The School campus on Parcel Three comprises approximately fifty-three acres of land and includes dormitories, classrooms, a laboratory, a gymnasium, a cafeteria, staff housing and a cattle-grazing area. The purpose of the School is to educate Native American children in grades nine through twelve. During the 2002–2003 academic year, there were 731 students enrolled in the School. All of the students are Native American. The majority of the students are from the Navajo Reservation, although there are also students from North Dakota, South Dakota, southern Arizona, the Hopi Reservation and the Zuni Tribe. Eighty percent of the students board at the School and the remaining twenty percent are day students who mostly reside in the Gallup area. Approximately twenty students live in the trailer park on the Merrill Property. There are boarding students who reside at the School during the regular academic session, from August through May, and during the summer session for four to five weeks. Students do not reside in the dormitories during Christmas vacation and Spring vacation or once they have graduated. There are approximately 200 staff members at the School, fifty of whom are teachers. Some staff members live in rental housing on the School campus. The remainder of the staff live in the Iyanbito, the Gallup area and in rental apartments and trailers on the Merrill Property.

As with all of the BIA-operated schools around the United States, whether on-reservation or off-reservation, the School is run by the BIA. All of the funding for the School comes from Congress and is administered by the BIA, including maintenance of the School property and payment of the School's bills. The School has a principal, who is an employee of the BIA. In accordance with federal statute, the School has a Board which is appointed by the Navajo Nation council. See 25 U.S.C. § 2021. The Navajo Nation council also determines how many members will be on the Board. The School's Board has seven members, each of whom comes from a chapter of the Navajo Nation that has students at the School. The Board determines and approves school policies, the curriculum and the budget. The principal can appeal the Board's decisions to the BIA which has the power to overturn the Board's decisions. At the hearing, Principal Adam Bull testified that, in his experience, the BIA has never overturned a policy implemented by the School Board.

Water for the School comes from five wells which are located on School property and which are maintained by facilities staff employed by the School. Food is not produced at the School but rather is ordered from a company called Nobel–Sysco located in Albuquerque. There are no electricity or gas generating capabilities at the School. Gallup Joint Utilities supplies electricity and gas to the School. There are no telephone communication facilities on the School property. All such services are provided by Qwest. Outside of the campus grounds but within Parcel Three, there are four churches—Baptist, Church of the Latter Day Saints, Christian Reform and Catholic. The closest Navajo chapter house is located in the Iyanbito. The BIA has granted easements for the utility lines, telephone service and churches on Parcel Three.

For medical services, students and staff of the School generally go to the Gallup Indian Medical Center. Ambulance service is provided exclusively by Med Star

which is located in Gallup. There are no mental health treatment facilities at the School. There is a clinic on the School campus which is run by Indian Public Health Services and staffed by a part-time nurse and three or four dentists. The nurse spends one day each week for approximately four hours at the clinic. In addition, physicians occasionally staff the clinic. Access to the clinic is not limited to students and staff at the School but is limited to Native Americans. Individuals who live on Parcel Three, the Iyanbito and surrounding areas all use the dental and medical services provided at the clinic. There is a volunteer fire department located on Parcel Three.

Canteens on the School campus are open when the School is in session. There is a School bank which is available to students during the School term. There are no movie theaters, concert venues, restaurants, grocery stores or stores of any kind at the School. The School, however, does provide entertainment for the students. The only grocery store and only restaurant within the boundaries of Parcel Three are located on the Merrill Property.

With regard to the provision of law enforcement services, Principal Bull testified that the Navajo Nation has prosecuted misdemeanor offenses that occurred at the School. In addition, Principal Bull testified that, in non-emergency situations requiring law enforcement, the School contacts the Navajo police. According to Principal Bull, in emergency situations, calls are made to 911.

Sandra Sweeney, the director of communications for McKinley County Metropolitan Dispatch Authority, testified that when a call is made to 911 from the School, dispatch normally sends a deputy from the McKinley County Sheriff's Office. If a sheriff's deputy is not available, dispatch sends a state police unit. If a state police unit is not available, dispatch contacts the Navajo police. If the call is reporting a potentially violent situation or a situation in progress, dispatch sends someone from each of the three law enforcement agencies: the Sheriff's office, the New Mexico State police and the Navajo police. Ms. Sweeney testified that because the Navajo police has a very large area to cover and a low number of officers, it often takes days for a Navajo police officer to respond to a call. For this reason, she testified, it is dispatch's practice to call the Sheriff's office or the State police before contacting the Navajo police. Ms. Sweeney testified that, in her experience, the Sheriff's office is the law enforcement agency sent most often to respond to calls from the School.

Walter Edward Marble, a patrol sergeant for the Navajo police, testified that, with regard to providing law enforcement services, the Navajo police does not make any distinction between the treaty trust portion of the Navajo Nation on Parcel One and the School and its surrounding area on Parcel Three. Sergeant Marble testified that the Navajo police is the primary law enforcement agency for this entire area. In addition, Sergeant Marble testified that, in years past, the Navajo police has exchanged cross-commissions with the McKinley County Sheriff's office and the State police. Under these cross-commissions, the closest responding officer would arrive at the scene and ensure that the case was investigated by the appropriate agency. According to Sergeant Marble, the Sheriff's office primarily responds to calls for service when a Navajo police unit is not available.

The Navajo police does not have a 911 system in New Mexico. Sergeant Marble confirmed that, in emergency situations, individuals in the Fort Wingate area call 911, which connects them to metro dispatch. According to Sergeant Marble, dispatch notifies the deputy sheriffs on duty

and also calls the Navajo police. The Navajo police gives dispatch a time of arrival. The deputy sheriffs go to the scene, render the situation safe and stand by until a Navajo police officer arrives. Sergeant Marble testified that the Navajo police receives approximately 200 calls a year from the School.

According to Sergeant Marble, the Navajo police officers who respond to calls at the School do not work out of Crown Point but rather are sub-stationed officers, two of whom live at Church Rock and one of whom, Officer Franklin Patone, lives on Parcel Three. Sergeant Marble testified that Officer Patone has lived on Parcel Three for approximately five to six years. Also according to Sergeant Marble, the Navajo police is the only law enforcement agency that has the authority to make arrests on Parcel Three.

The Navajo Nation Division of Health ("DOH") provides various social services to members of the Navajo tribe. For purposes of determining eligibility for services, the DOH does not distinguish between those tribal members who reside in the Iyanbito within Parcel One and those tribal members who reside at the School or in the surrounding area within Parcel Three. The DOH considers the School to be within the Iyanbito chapter boundaries. The DOH provides a comprehensive health education program directly to the School. This program involves health educators working in conjunction with the School faculty to provide classroom instruction on health issues, including HIV/AIDS prevention. In order to receive the remainder of the services provided by the DOH, tribal members who reside on Parcel Three must travel to the Iyanbito or other parts of the Navajo Nation.

Pursuant to federal statute, the Navajo Nation Division of Social Services ("DSS") contracts with the BIA to administer several social service programs that would otherwise be administered by the BIA. The DSS-administered programs include cash assistance, tribal work experience, child welfare and adult care. All DSS services are available to eligible individuals who reside at the School and in the surrounding area on Parcel Three and to residents of the Iyanbito on Parcel One. In order to apply for services, individuals who live in this area go to the DSS sub-office in Gallup. DSS does not provide any allotment of funds to the School itself.

Within the Navajo Division of Education, there is a department that administers an accreditation program called the North Central Accrediting Association ("Accrediting Association"). The Accrediting Association sets academic standards for schools on the Navajo Reservation and off-reservation schools that are run by the BIA or have contracts or grants with the BIA. Under the accrediting process, each participating school develops a five-year improvement program. The school provides yearly progress reports to the Accrediting Association. The Accrediting Association does on-site reviews of the school in the third and the fifth year of its improvement program. The School is accredited by the Accrediting Association.

The Navajo Division of Education also administers other programs, including a clothing program, which provides clothes to Navajo children, and a scholarship program, which provides funding for Navajo students who attend college. Students who attend the School and are enrolled members of the Navajo tribe are eligible for the services and programs administered by the Navajo Division of Education.

As set forth above, the Iyanbito, which is held in trust for the Navajo Nation, is directly north of Parcel Three. The Iyanbito chapter is recognized by the Navajo Nation as a governmental sub-unit of the Navajo Nation. The Iyanbito chapter

house is located in the Iyanbito. Approximately 700 members of the chapter live in the Iyanbito and approximately fifty chapter members live at the School.

Lawrence Morgan, delegate to the Navajo Nation council for the Iyanbito and Pinedale chapters, testified that the Iyanbito chapter does not exercise any real authority over the School because the tract of land on which the School is located has been withdrawn for school purposes. Nevertheless, the testimony presented by the Navajo Nation demonstrates that the Navajo Nation does not recognize the boundaries between the parcels of land in the Fort Wingate area. Rather, the Navajo Nation views the entire area as one community, based upon the activities that go on in Parcel One and Parcel Three, including cultural gatherings, governmental activities and fund-raising activities. Residents of the Iyanbito attend social activities at the School, including weddings, basketball tournaments, cake walks, dances and cultural dances. Similarly, students at the School engage in social activities in the Iyanbito, including fund-raising and practicing bronco riding and roping. Chapter members who live on Parcel Three attend chapter meetings in the Iyanbito and vote in tribal elections at the chapter house. At one point, there were summer programs at the chapter house, which were attended by students at the School. Young children of staff who reside at the School attend the Head Start Program in the Iyanbito. There is a bus that runs between the School housing area and the Head Start Program. The major employers in the area of Parcel One and Parcel Three combined are the Navajo Head Start Program on Parcel One and Wingate Elementary School and the School on Parcel Three.

The Navajo Nation also presented testimony regarding the ancestral and traditional presence of the Navajo people which exists in the Fort Wingate area without regard to the current boundaries among the four tracts. Prior to World War II, Navajo families who had been living on the Fort Wingate lands were removed from the lands. Their shelters and hogans remain on what is now Parcel Two. The Navajo Nation is in the process of attempting to acquire the military tract of the Fort Wingate area on Parcel Two in order to protect cultural properties and sacred sites and to increase economic opportunities for the Navajo people in the surrounding areas. There is also a development project underway involving land on Parcel One. Charlene Begay Platero, who is employed by the Navajo Nation as an industrial development specialist and team leader on the Fort Wingate land transfer project, testified that medicine people, such as herbalists and chanters, gather herbs for medicine and healing ceremonies on Parcel Three. Similarly, Mr. Morgan testified that his ancestors lived on land that is now on Parcel Three.

On May 14, 2002, Defendant filed the instant motion to dismiss the indictment for lack of jurisdiction. The government filed its response on July 26, 2002. Defendant's reply papers followed on August 29, 2002. The State of New Mexico, the Zuni Tribe and the Navajo Nation filed *amicus* briefs on September 12, 2002, September 13, 2002 and September 16, 2002, respectively.

In her motion, Defendant claims that the School is not a dependent Indian community within the meaning of 18 U.S.C. § 1151 and thus is not located in Indian country. Accordingly, Defendant argues, the federal government has no jurisdiction to prosecute this or any other criminal offense committed at the School. The Zuni Tribe agrees with Defendant.

Neither the District of New Mexico nor the Tenth Circuit has addressed the issue

of whether there is federal criminal jurisdiction over the School. The New Mexico Court of Appeals ruled on this issue in *State v. Dick,* 127 N.M. 382, 981 P.2d 796 (1999), *cert. granted,* 127 N.M. 391, 981 P.2d 1209 (1999), *cert. quashed,* 129 N.M. 208, 4 P.3d 36 (2000), holding that the School is located in Indian country and that, accordingly, the state government has no criminal jurisdiction. The State of New Mexico petitioned for *certiorari* to the New Mexico Supreme Court, which granted review but then quashed the writ of *certiorari* without explanation.

In *Dick,* the United States government filed an *amicus* brief with the New Mexico Supreme Court, arguing that the School is not a dependent Indian community and thus not in Indian country. In the instant case, the United States government takes the opposite position, asserting federal criminal jurisdiction. The United States government, however, makes it clear that it has brought this action only because the state has refused to prosecute Defendant based on the holding in *Dick* that the state courts do not have jurisdiction over crimes committed at the School.

In its response to Defendant's motion, the United States government presents no argument in support of its assertion of jurisdiction. Rather, the government states that it "continues to believe that the New Mexico Court of Appeals' decision in *Dick* misapplied Supreme Court and Tenth Circuit case law and, in so doing, wrongly purported to confer federal criminal jurisdiction on the land housing the Indian School." United States' Response at 3–4. Thus, neither party to this case believes that this Court has jurisdiction over the instant action. Only the Navajo Nation and the State of New Mexico, as *amicus curiae,* argue that federal jurisdiction exists over the School and that, accordingly, Defendant's motion to dismiss should be denied.

The Court held an evidentiary hearing on January 21, 2003 during which Defendant and the government presented evidence. The Court continued the hearing in order to allow the Navajo Nation to present evidence. A second evidentiary hearing was held on June 23, 2003 during which the Navajo Nation presented evidence. At the conclusion of the hearing, the Court took Defendant's motion under advisement.

### STANDARD

"Indian country" is defined in 18 U.S.C. § 1151 as follows:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ... (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments ...

At issue in the instant case is whether the School is a dependent Indian community within the meaning of § 1151(b).

In *Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531 (10th Cir. 1995), the Tenth Circuit "established a two-step process for evaluating an assertion of dependent Indian community status." *United States v. Adair,* 111 F.3d 770, 773–74 (10th Cir.1997). "The first step requires an analysis of whether the area proposed as a dependent Indian community is appropriate as a community of reference." *Id.* at 774. The second step of the *Watchman* process requires application of "a four-factor test to the community of reference in order to determine if that community is indeed a dependent Indian community." *Id.* The four factors are:

(1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "author-

ity to enact regulations and protective laws respecting this territory,"; (2) "the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,"; (3) whether there is "an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,"; and (4) whether such lands have ·been set apart for the use, occupancy and protection of dependent Indian peoples."

*Watchman,* 52 F.3d at 1545 (citations omitted).

Until its decision in *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), the United States Supreme Court had "not had an occasion to interpret the term 'dependent Indian communities.'" *Id.* at 527, 118 S.Ct. 948 (citation omitted). In *Venetie,* the Supreme Court held that this term "refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.* The Supreme Court explained that:

> The federal set-aside requirement ensures that the land in question is occupied by an 'Indian community'; the federal superintendence requirement guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question.

*Id.* at 531, 118 S.Ct. 948. In reaching its holding, the *Venetie* Court disapproved of the Ninth Circuit's six-factor test for identifying an Indian community. The Court stated that, by balancing factors "far removed from the requirements themselves ... [against] other, more relevant ones, ... the Court of Appeals reduced the federal set-aside and superintendence requirements to mere considerations." *Id.* at 531 n. 7, 118 S.Ct. 948.

In *HRI, Inc. v. Environmental Protection Agency,* 198 F.3d 1224 (10th Cir.2000), the Tenth Circuit addressed the effect of *Venetie* on the *Watchman* dependent Indian community test. First, the Tenth Circuit stated that *Venetie* "may require some modification of the emphases in the second step of our dependent Indian community test in *Watchman.*" *Id.* at 1248. The four factors in this second step are virtually identical to the factors in the Ninth Circuit test of which the Supreme Court disapproved in *Venetie.* Second, the Tenth Circuit stated that "nothing in *Venetie* speaks to the propriety of the first element of [the *Watchman* ] test—determination of the proper community of reference." *Id.* at 1248. The Tenth Circuit noted that, "because of the categorical effect of the Alaska Native Claims Settlement Act ("ANCSA") on virtually all Alaskan native lands, the Supreme Court in *Venetie* was not even presented with the question of defining the proper means of determining a community of reference for analysis under § 1151(b)." *Id.* at 1249. Thus, "[b]ecause *Venetie* does not speak directly to the issue," the Tenth Circuit held that *Watchman* "continues to require a 'community of reference' analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b)." *Id.*

■ The New Mexico Supreme Court has specifically declined to follow Tenth Circuit precedent. Instead, in *State v.*

*Frank*, 52 P.3d 404 (2002), the New Mexico Supreme Court held that, "[i]n light of the clear guidelines in the *Venetie* opinion, we decline to incorporate a community of reference inquiry into our case law." *Id.* at 409. This Court, however, must follow Tenth Circuit precedent. In light of this precedent, in order to determine whether the School or the land on which the School is located is a dependent Indian community within the meaning of § 1151(b), this Court first must determine the appropriate community of reference. *See Adair*, 111 F.3d at 774. Once the Court determines the appropriate community of reference, the Court next must apply the *Watchman* factors, as modified by *Venetie*. Accordingly, the Court must analyze whether the School or its land (1) was set aside by the federal government for the use of Indians as Indian land; and (2) is under federal superintendence. *See Venetie*, 522 U.S. at 527, 118 S.Ct. 948.

## DISCUSSION

### I. *Community of Reference Analysis*

■ In determining whether a specific area is a community of reference, the Court first must analyze "the status of the area in question as a community." *Watchman*, 52 F.3d at 1543. In determining whether an area is a community, the *Watchman* Court first discussed the importance of "the existence of an element of cohesiveness ... [which] can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality." *Id.* at 1544. *Watchman* went on to define a community as "a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life." *Id.* In *Adair*, the Tenth Circuit added to this analysis

that the "appropriate starting point is the geographical definition of the area proposed as a community.... Without some objective boundaries, consideration of the applicable factors in the dependent Indian community analysis itself becomes problematic." *Adair*, 111 F.3d at 774.

Next, the Court must focus on "the community of reference within the context of the surrounding area." *Watchman*, 52 F.3d at 1544. This analysis involves looking "to the relationship of [the area proposed as a community] to the surrounding area." *Id.* Specifically, the Court must examine the extent to which "[n]earby towns, the county, and the state provide infrastructure, government, [and] essential services." *Adair*, 111 F.3d at 775.

In *Watchman*, the Tenth Circuit found that the district court had erred by using as the community of reference the South McKinley Mine, which is located outside the Navajo Reservation in northwestern New Mexico near the Arizona–New Mexico border and is approximately twenty to twenty-five square miles. The Tenth Circuit noted that the "meaning of community ... connotes something more than a purely economic concern." *Watchman*, 52 F.3d at 1544. Specifically, the Tenth Circuit explained:

> The South McKinley Mine does not exist in a vacuum. Its workers must eat, sleep, shop, worship, and otherwise engage in life's daily routines. The governmental or private entities that originally established, and continue to provide, the infrastructure required for the mine's ongoing operation are necessarily relevant to the dependent Indian community inquiry.

*Id.* at 1545. The Tenth Circuit remanded the case to the district court to determine the appropriate community of reference.

In *Blatchford v. Sullivan*, 904 F.2d 542 (10th Cir.1990), *cert. denied*, 498 U.S. 1035,

111 S.Ct. 699, 112 L.Ed.2d 689 (1991), a companion case to *Watchman,* the Tenth Circuit examined the community of Yah–Ta–Hey, located eight miles north of Gallup and two miles south of the Navajo Reservation, within the context of the surrounding area. The district court identified Ya–Ta–Hey as a "rural and 'readily identifiable residential and trading community' including the commercial establishments at the intersection of U.S. Highway 666 and State Highway 264, a small housing subdivision known as Navajo Estates, and the surrounding area within three to five miles of the intersection." *Id.* at 548 (citation omitted). The district court found that:

> [T]he relationship of the community to the federal government and the Navajo nation was such that the Navajos must travel outside the community to obtain BIA and tribal services with the exception of some tribal law enforcement services. In contrast, Gallup, McKinley County, and the state of New Mexico all provided a variety of services to Yah–Ta–Hey, including water, roads, landfills, public schools, and law enforcement."

*Id.* at 548. The Tenth Circuit further found that neither the Navajo Nation nor the federal government had a relationship with the Ya–Ta–Hey community "qua community." *Id.* at 549. According to the Tenth Circuit:

> Although Navajo inhabitants vote in tribal elections and are a part of the Rock Springs chapter (local governmental unit) of the Tribe, eligibility for a variety of services flows to individual inhabitants of the area by virtue of their identification as part of the Navajo Nation, not by virtue of their settlement within an established Indian community.

*Id.* The Tenth Circuit found that Ya–Ta–Hey was "born out of opportunities for private commercial gain." *Id.* at 548.

Based in part on these findings, the Tenth Circuit affirmed the district court's holding that Ya–Ta–Hey is not a dependent Indian community.

In *Adair,* the Tenth Circuit found that Rocky Mountain, a rural area of approximately six to twelve square miles surrounding the Rocky Mountain school, was not an appropriate community of reference. Most of the land in this area was held restriction-free by Indian and non-Indian individuals, although up to fifteen percent of the land remained restricted by the federal government for the protection of Indian allottees. Half of the 400 residents in the area were Indian, but did not live in a communal lifestyle. The Cherokee Nation provided the Rocky Mountain School with funds from the BIA based upon its Indian student population. Residents went to shops, banks, hospitals and doctors in the nearby town of Stilwell. Electricity was provided by a public utility company located in Stilwell and Fayetteville, Arkansas; water was provided by individual wells or a state service; trash was deposited in landfills provided by the Cherokee Nation for Adair County, generally; and the state of Oklahoma and the county of Adair built and maintained roads. Law enforcement was provided by both the County Sheriff's office and the Cherokee Nation's Marshall's Service. Cherokee Indians living in the area were eligible for social services administered by the Cherokee Nation. The Tenth Circuit noted, however, that these services were available "because they are Cherokee Indians living within the original Cherokee Nation fourteen county area in northeastern Oklahoma, not because they live in the Rocky Mountain area or because of any unique status attributed to the Rocky Mountain area." *Adair,* 111 F.3d at 773.

Based on these characteristics, the Tenth Circuit found that Rocky Mountain

was "neither 'an established municipality [nor] a formally incorporated community and possesse[d] no formal or definite boundaries,'" and lacked "defining credentials as a community." *Id.* at 774 (citation omitted). The Tenth Circuit further found that Rocky Mountain was missing most of the aspects of community. While Rocky Mountain had Indian and non-Indian cemeteries, an Indian stomp ground, an elementary school, three churches, one of which was Indian, a convenience store and some farms, the Tenth Circuit found that "Rocky Mountain lacks the quality and quantity of activity and institution which create infrastructure and, in turn, community; features like a hospital, a doctor, a grocery store, a public utility office, a bank, a restaurant." *Id.* at 775.

The Tenth Circuit next considered the Rocky Mountain area within the context of the surrounding area. While admitting that "a community cannot be expected to originate all or even most of the 'needs, necessities, and wants of modern life,'" the Tenth Circuit found that "Rocky Mountain defies the meaning of community.... The Rocky Mountain area is not its own source of infrastructure. Nearby towns, the county, and the state provide infrastructure, government, essential services, and employment for the Rocky Mountain area." *Id.* (citation omitted). Although acknowledging that "the Cherokee residents [of Rocky Mountain] share a common history, culture and non-English language," the Tenth Circuit found that the cohesiveness among these residents "is not a substitute for and does not overcome the absence of infrastructure and essential services generated from within." *Id.* The Tenth Circuit concluded that Rocky Mountain "is not a community and thus cannot be a community of reference for testing the presence of a dependent Indian community." *Id.*

In *Dick*, the New Mexico Court of Appeals reversed the district court's decision denying the defendant's motion to dismiss for lack of state jurisdiction over a crime that occurred on Parcel Three. The district court had treated Parcels Two, Three and Four as the community of reference. The Court of Appeals held that this was error and instead found Parcel Three to be the appropriate community of reference. In making this finding, the Court of Appeals stated that the "overarching concern ... is the element of cohesiveness." *Dick*, 127 N.M. at 385, 981 P.2d 796. In light of the common interests, infrastructure and geographical definition of the area, the Court of Appeals concluded that "parcel three, the BIA school community, stands out as the relevant community.... In fact, it is an educational community where, primarily, Indian students board and some faculty live." *Id.*

■ Based upon the testimony presented at the hearing, it is clear that a culturally cohesive community exists in the Iyanbito chapter as a whole. The boundary between Parcel One and Parcel Three is fluid for purposes of Navajo identity, employment, cultural activities and ancestry. This suggests that the whole Iyanbito chapter might be the relevant community of reference. As set forth in *Adair*, however, the geographical definition of an area is the starting point for the community of reference analysis. Moreover, *Adair* instructs that objective boundaries are crucial to determining the appropriate community of reference. Here, there is an objective boundary that demarcates land subject to different authority, as Parcel One is administered by the BIA in trust for the Navajo Nation while Parcel Three is administered by the BIA for BIA purposes only. Accordingly, for purposes of determining the appropriate community of reference, this Court cannot ignore the

geographical distinction between Parcel Three and Parcel One.

This Court agrees with the New Mexico Court of Appeals that the appropriate community of reference is the School community located on Parcel Three. The element of cohesiveness exists in that all of the residents are there for one common goal: the education of Native American children. Similarly, the entire tract of land is considered one entity held by the federal government and administered by the BIA for the sole purpose of the education of Native American children. All of the students share a Native American culture and ancestry and the majority of the students share a Navajo culture and ancestry. Indeed, testimony presented at the hearing revealed that Native American customs are actively practiced at the School. A large majority of the students reside at the School, as do members of the staff. Moreover, all of the residents of the School live communally.

The extraordinary degree of cohesiveness in purpose, land title, culture and lifestyle which exists at the School distinguishes this community from the areas analyzed in *Watchman, Blatchford* and *Adair.* For example, the Tenth Circuit found that the only common purpose of both the South McKinley Mine and the Ya–Ta–Hey community was private commercial activity, a purpose insufficient to establish a cohesive community. This "purely economic concern" is different in nature and significance from the educational purpose of the School community. *Watchman,* 52 F.3d at 1544. Moreover, Ya–Ta–Hey was comprised of different areas to which title was held differently: privately owned land and Navajo allotment land. Similarly, the three distinct sections within Ya–Ta–Hey did not share one culture or ancestry, but rather had different ethnic compositions: one was "largely non-Indian," one was "mixed" and one was

"largely Navajo." *Blatchford,* 904 F.2d at 548. Similarly, in *Adair,* the Tenth Circuit identified no common interests in the Rocky Mountain area. Indeed, Rocky Mountain lacked any discernable geographical definition or boundaries. The land was not held as one tract, but rather included land held restriction-free by Indian and non-Indian individuals in addition to restricted Indian allotments. Only one-half of the residents in the area were Indian and none of the residents lived in a communal lifestyle. Thus, the School community resonates with the very qualities which the Tenth Circuit discussed and found to be lacking in the South McKinley Mine, Ya–Ta–Hey and Rocky Mountain.

The School community does rely heavily on the surrounding area for much of its infrastructure and essential services, including food services, utilities, medical services and emergency services. Navajo residents of Parcel Three must travel outside of the area to attend Iyanbito chapter meetings and tribal elections and to apply for most of the services for which they are eligible as members of the Navajo Nation. Moreover, eligibility for such services is generally dependent on membership in the Navajo Nation rather than residence within the School community. Finally, law enforcement for the area is provided jointly by the County, the State and the Navajo Nation.

The Court, however, does not find the fact that the School relies in part on outside sources to be determinative of the community of reference issue. Testimony at the hearing established that the socioeconomic conditions of the School community are below the mainstream in the United States. Moreover, this is a small community. It is not feasible that a community of this economic status and size would have the funds necessary to provide all of its own infrastructure and es-

sential services. Indeed, the Tenth Circuit in *Adair* recognized as much when it stated, "a community cannot be expected to originate all or even most of the 'needs, necessities, and wants of modern life.'" *Adair*, 111 F.3d at 775. This Court does not interpret Tenth Circuit precedent to foreclose the finding of a community of reference where all of the elements of a cohesive community exist save the resources to allow self-sufficiency.

Moreover, the School community does in fact provide some of its own infrastructure and essential services. For example, it is self-sufficient in its water supply. Some medical and dental services are provided on-site at the health clinic. Within the boundaries of Parcel Three, there is a fire station and there are four churches. The School provides meals at the cafeteria and canteens, on-campus entertainment and a student bank.

With regard to the joint provision of law enforcement, there is a dispute over who has primary jurisdiction to enforce the law and make arrests at the School. This dispute is a direct result of the current uncertainty regarding the jurisdictional status of this area. Accordingly, to find the sharing of law enforcement responsibility to be determinative of the community of reference issue would only beg the question. The Court notes, however, that there is a Navajo police officer who lives within the School community and responds to calls from the School.

With regard to social services provided by the Navajo Nation, there is direct provision of some such services to the School, including the DOH health education program and Accrediting Association review. Similarly, the Iyanbito chapter supports school fund-raising and extracurricular activities, both on-campus and at the chapter house. Accordingly, the Navajo Nation maintains a relationship with the School community qua community. Indeed, it cannot be disputed that the federal government maintains such a relationship with the School community. For all of these reasons, the Court finds the School community on Parcel Three to be the appropriate community of reference.

## II. *Watchman Analysis*

The Court next must apply the *Watchman* factors, as modified by *Venetie*, to the School community as the community of reference. There is no dispute that the second factor, whether the land is under federal superintendence, is met. Accordingly, the only factor which the Court must consider is whether the School community constitutes land set aside by the federal government for the use of Indians as Indian land. *See Venetie*, 522 U.S. at 527, 118 S.Ct. 948.

In *Venetie*, the Supreme Court explained that "[t]he federal set-aside requirement ensures that the land in question is occupied by an 'Indian community.'" *Id.* at 531, 118 S.Ct. 948. The Supreme Court also explained that this requirement is based on its "Indian country precedents, which indicate ... that the Federal Government must take some action setting apart the land for the use of the Indians 'as such.'" *Id.* at 530 n. 5, 118 S.Ct. 948. Specifically, the Supreme Court cited *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), where it had held that the Reno Indian Colony was a dependent Indian community. The Reno Indian colony was a 28.38 acre parcel purchased with funds appropriated by Congress for the purpose of "provid[ing] lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a permanent settlement." *Id.* at 537, 58 S.Ct. 286. The Supreme Court noted that "Indians of the Reno Colony have

been established in homes under the supervision and guardianship of the United States." *Id.* at 538, 58 S.Ct. 286. Moreover, the Supreme Court explained: "The fundamental consideration of both Congress and the Department of the Interior in establishing this colony has been the protection of a dependent people. Indians in this colony have been afforded the same protection by the government as that given Indians in other settlements known as 'reservations.'" *Id.* The Supreme Court summarized the facts rendering Reno Indian Colony a dependent Indian community as follows: "The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the government. The government retains title to the lands which it permits the Indians to occupy.... [I]t is not reasonably possible to draw any distinction between this Indian 'colony'; and 'Indian country.'" *Id.* at 539, 58 S.Ct. 286.

Similarly, in *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), the Supreme Court addressed the status of twenty scattered pueblos owned communally in fee simple by the Pueblo Indians under grants from the King of Spain that were subsequently confirmed by Congress. The Supreme Court found that the Pueblo Indians were treated by the federal government as dependent peoples in a manner indistinguishable from Indians on reservations. Specifically, the Supreme Court stated:

> [B]y a uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and ... this assertion of guardianship over them cannot be said to be arbitrary, but must be regarded as both authorized and controlling.

*Id.* at 47, 34 S.Ct. 1. Accordingly, the Supreme Court held that a federal law prohibiting the introduction of liquor into Indian country was applicable at the pueblos.

In *Blatchford,* the Tenth Circuit examined the series of federal cases, including *McGowan* and *Sandoval,* which spelled out the standards guiding the determination of what constitutes a dependent Indian community. The Tenth Circuit concluded that in each case which found the existence of a dependent Indian community, "the dependent communities represented clusters of Indians grouped together in their own special communities on land owned by a tribe or held in trust for them and arguably outside an established reservation." *Blatchford,* 904 F.2d at 546. In addition, the Tenth Circuit reviewed the Eighth Circuit cases which addressed the issue of a dependent Indian community and concluded that "[i]n all three of the cases in which dependent Indian communities were established, the lands in question were tribal trust lands." *Id.* at 548.

Based on this precedent, the Tenth Circuit found that Ya–Ta–Hey was not a dependent Indian community, as it was "not one born out of a public need to provide land for use, occupancy, and protection of a dependent people." *Id.* Moreover, the Tenth Circuit found that "[t]he fact that much of the area is held in the form of trust allotments does not establish that the 'community' itself was established for the use, occupancy, and protection of a dependent people." *Id.* at 549. Finally, the Tenth Circuit found that the case before it "contrast[ed] with those described previously, in which dependent Indian communities were located on tribal lands or tribal trust lands and were created by the Indians themselves or the federal government

to provide for their economic and political protection." *Id.*

In *Dick,* the New Mexico Court of Appeals considered whether the land on Parcel Three meets the federal set-aside requirement of *Venetie.* The Court of Appeals interpreted *Venetie* to require only "that the land be 'set aside' by the federal government for Indian use." *Dick,* 127 N.M. at 386, 981 P.2d 796. In 1950, Congress enacted Public Law 567 in order to transfer the land in Parcel Three from the Department of Defense to the Department of the Interior for use by the BIA. This enactment states, "[t]itle to the land so transferred shall remain in the United States for the use of the Bureau of Indian Affairs." Pub. Law No. 81–567, 64 Stat. 248 (1950). The Court of Appeals held that this language was sufficient to satisfy the set-aside requirement of *Venetie.*

Based upon *Venetie* and the precedent upon which it relied, this Court cannot agree that the land at issue here meets the federal set-aside requirement. As a review of the case law makes clear, there has never been a finding of a dependent Indian community unless the community at issue was located on tribal lands or land held in trust for Native Americans. In the instant case, the land at issue is neither tribal land nor land held in trust for the Navajo Nation or any other Native American group. To the contrary, the land was transferred to the Department of the Interior specifically for the use of the BIA. There is no tribal governmental presence involved in the administration of the land on Parcel Three. The land is administered by the BIA without any treaty, trust or other obligation to the Navajo Nation or any other Native American group. Accordingly, this land was set aside for the use of the BIA, not for the use of Indians as Indian land.

Moreover, in each case where a dependent Indian community has been found to exist, that community was created by Native Americans themselves or the federal government to provide for the use, occupancy and protection of the community. By contrast, the School is a federal facility established by the federal government to provide for the education of Native American children. Unlike the pueblos in *Sandoval* or the colony in *McGowan,* no Native American tribe dwells on the land in Parcel Three as part of its permanent homeland or has legal or equitable title to that land. While students and staff are entitled to reside at the School, any right of use, occupancy and protection is dependent upon attendance or employment at the School. It is a student or staff member's individual relationship with the School, rather than membership in a Native American community, that provides any right of use, occupancy or governmental protection. Moreover, ultimate authority over the School itself rests with the BIA without any obligation to the Iyanbito Chapter, the Navajo Nation or any other tribal government. The School community thus is land set aside for the use of the BIA as educator of Native American children, not land set aside for the use of Indians as Indian land.

BIA schools exist both within and without the boundaries of Indian country. Testimony presented at the hearing established that the purpose of the School and its means of administration are identical to that of all BIA schools, regardless of whether they are located within or without the boundaries of Indian country. There is no evidence that, in any other instance, the presence of a BIA school alone has changed the status of the land on which it is situated. The fact that the School is a BIA school whose purpose is to provide an education to Native American children thus cannot be the defining feature to es-

tablish a dependent Indian community on Parcel Three. A holding to the contrary would be an improper expansion of both the language and the historical context of the term dependent Indian community.

This conclusion is supported by the only two cases which this Court has found that address the issue of whether an Indian school constitutes Indian country. In *C.M.G. v. State,* 594 P.2d 798 (Okla.Crim. App.1979), *cert. denied,* 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 421 (1979), the Oklahoma Court of Criminal Appeals held that the Chilocco Indian School was a dependent Indian community. The land at issue

> had been reserved by Congress for an Indian school and for 'the settlement of such friendly Indians belonging within the Indian Territory as have been or who may hereafter be educated at the Chilocco Indian Industrial School in said Territory.' The land was set aside for that purpose by an executive order, that purpose was incorporated in the 1891 treaty between the Cherokee Nation and the United States, and that incorporation was ratified in 1893 by the United States Congress.

*Id.* at 803. In reaching its decision, the court relied upon the fact that the Chilocco Indian School was "a tract of land which was specifically reserved for the settlement of friendly Indians at the time the Cherokee outlet was ceded to the United States." *Id.* at 804. Thus, central to the Oklahoma court's holding was the fact that the language in the executive order explicitly stated that the land was set aside for the use of Indians as Indian land. There is no such language in the enactment which transferred the land in Parcel Three to the Department of the Interior for the use of the BIA.

The *C.M.G.* court distinguished the facts before it from those in *United States v. Myers,* 206 F. 387 (8th Cir.1913), where the Eighth Circuit held that an Indian school was not Indian country. In *Myers,* certain land had been reserved from land sold to the federal government by the Kiowa, Comanche and Apache tribes "for the use of the common schools, ... and for university, agricultural colleges, normal schools, and public buildings of the territory and future state of Oklahoma." *Id.* at 389. Subsequently, the Secretary of the Interior issued an order reserving from this land "certain lands for agency, school, religious, and other public uses." *Id.* The federal government thereafter established on the land so reserved the Rainy Mountain School for Native American children. The Eighth Circuit discussed the relevant standard for determining whether the Rainy Mountain School was Indian country as follows:

> Indian country ... is, as conclusively appears from all the cases, a country to which the Indians retained the right of use and occupancy, involving—under certain restrictions—freedom of action and of enjoyment in their capacity as a distinct people ... [T]he term does not apply to any tract owned and controlled by the government and devoted by it, whether as a so-called reservation or mere foundation, to the benefit of the Indians, exclusively or otherwise, unattended by any semi-independent use and occupancy involving such title, ownership, and control as has always inhered in the Indians as a distinct people and not merely as individual wards.

*Id.* at 394. Applying this standard, the Eighth Circuit found that the setting aside of the land on which the Rainy Mountain School was built fell "far short of creating a reservation for tribal use." *Id.* at 393. The Eighth Circuit explained, "this setting apart of a limited tract of the public domain for a school which the government devotes mainly, or even entirely, to the training and education of Indian children, attending in their individual capacity, could

not operate to convert that tract into Indian country." *Id.* at 394.

As in *Myers,* the land on Parcel Three has been used as an Indian school. Also as in *Myers,* however, the land was not "reserved for the use of Indians when it was acquired by the Untied States." *C.M.G.,* 594 P.2d at 802. Moreover, there is no indication that Native Americans, as a distinct people and not merely as individual students and staff members, have any right of use, occupancy or control of the School or its land. The setting apart of Parcel Three for a BIA school devoted to the education of Native American children who attend the School in their individual capacity is simply insufficient to convert Parcel Three into a dependent Indian community.

### *CONCLUSION*

As a threshold matter, the Court has identified the School community on Parcel Three as the appropriate community of reference for determining whether the School is a dependent Indian community. Applying the *Watchman* factors as modified by *Venetie* to the School community, the Court finds that the School community is under federal superintendence and thus meets the second factor but does not constitute land set aside by the federal government for the use of Indians as Indian land and thus fails to meet the first factor. Accordingly, the School community is not a dependent Indian community within the meaning of 18 U.S.C. § 1151(b) and thus is not located in Indian country. Federal jurisdiction over the School thus cannot be established under 18 U.S.C. § 1153, which provides for federal prosecution of certain offenses committed within Indian country. Accordingly, this Court has no jurisdiction over the offense charged in the instant action, which is alleged to have occurred at the School and was brought under 18 U.S.C. § 1153. This action thus must be dismissed for lack of jurisdiction.

**IT IS THEREFORE ORDERED** that Defendant M.C.'s Motion to Dismiss Indictment for Lack of Jurisdiction is hereby **GRANTED.**