UNITED STATES *v.* McGOWAN ET AL.

No. 138. Argued December 17, 1937.—Decided January 3, 1938.

*Mr. William H. Ramsey,* with whom *Solicitor General Reed, Assistant Attorney General McMahon,* and *Messrs. William W. Barron* and *W. Marvin Smith* were on the brief, for the United States.

No appearance for claimants-respondents.[*]

MR. JUSTICE BLACK delivered the opinion of the Court.

The Court of Appeals affirmed a decree of the District Court dismissing libel proceedings brought by the United States praying forfeiture of two automobiles used to carry intoxicants into the Reno (Nevada) Indian Colony.[1] The proceedings were instituted under Title 25, U. S. C. § 247 which provides in part:[2]

"Automobiles or any other vehicles or conveyances used in introducing, or attempting to introduce, intoxicants into the Indian country, or where the introduction is prohibited by treaty or Federal statute, whether used by the owner thereof or other person, shall be subject to . . . seizure, libel, and forfeiture . . ."

Both courts below concluded that the Reno Indian Colony is not "Indian country" within the meaning of this statute.

The only question for determination is whether this colony is such Indian country. In this inquiry, both the legislative history of the term "Indian country" and the traditional policy of the United States in regulating the sale of intoxicants to Indians are important.

---

[*] The Government, in an Appendix to its brief, printed a brief submitted for the defendants in the District Court. .

[1] Certiorari granted, *post,* p. 666.

[2] 39 Stat. 970.

The Reno Indian Colony is composed of several hundred Indians residing on a tract of 28.38 acres of land owned by the United States and purchased out of funds appropriated by Congress in 1917 [3] and in 1926. [4]   The purpose of Congress in creating this colony was to provide lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a permanent settlement. [5]

The words "Indian country" have appeared in the statutes relating to Indians for more than a century. [6]   We must consider "the changes which have taken place in our

---

[3] 39 Stat. 123, 143.

[4] 44 Stat. 496.   The Act of 1917, under authority of which 20 acres of land were bought, contained items reading as follows:

"For the purpose of procuring home and farm sites, with adequate water rights, and providing agricultural equipment and instruction and other necessary supplies for the nonreservation Indians in the State of Nevada, $15,000 . . ."

"For the purchase of land and water rights for the Washoe Tribe of Indians, the title to which is to be held in the United States for the benefit of said Indians, $10,000, to be immediately available; for the support and civilization of said Indians, $5,000; in all, $15,000."

On recommendation of the Secretary of the Interior the 1926 additional appropriation was made and 8.38 acres were added to the Colony to take care of additional worthy Indian families who were anxious to establish homes in the Colony.   See, House Report No. 795, 69th Congress, 1st Session.

[5] Hearings on the 1917 Act disclosed the following statement by the Senator sponsoring the appropriation:

"These Indians live just from hand to mouth. . . .   They have no reservation to live on, and no protection whatever, and it is an outrage. . . .   It is useless to go and appropriate for some public lands unless you can acquire water rights for them. . . .   Those who take the most interest in Indian affairs in our State (Nevada) think the best thing to do is to purchase a tract of real agricultural land, say, 100 acres, close to Carson City, with a water right, where these Indians can raise garden stuff and chickens, and have a home and a market for their produce."   Hearings, Comm. on Indian Affairs, U. S. Senate, on H. R. 20150, Vol. 1, pp. 226, 227 (1915).

[6] See, Act of June 30, 1834, 4 Stat. 729, c. 161.

situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes." [7]  Also, due regard must be given to the fact that from an early period of our history, the Government has prescribed severe penalties to enforce laws regulating the sale of liquor on lands occupied by Indians under government supervision.  Indians of the Reno Colony have been established in homes under the supervision and guardianship of the United States.  The policy of Congress, uniformly enforced through the decisions of this Court, has been to regulate the liquor traffic with Indians occupying such a settlement. [8]  This protection is extended by the United States "over all *dependent Indian communities within its borders*, whether within its original territory or territory subsequently acquired, and *whether within or without the limits of a State*." [9]  [Italics added.]

The fundamental consideration of both Congress and the Department of the Interior in establishing this colony has been the protection of a dependent people. [10] Indians in this colony have been afforded the same protection by the government as that given Indians in other settlements known as "reservations."  Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out, [11] and it is immaterial whether Congress designates a settle-

---

[7] *Ex parte Crow Dog*, 109 U. S. 556, 561; *Clairmont* v. *United States*, 225 U. S. 551, 557.

[8] The House Committee Report on the 1917 appropriation reads in part: "The active and wholesome policy of the present commissioner in preventing the sale of intoxicating liquors to *the Indians* and in using their surplus or tribal funds in the purchasing of live stock to put on their reservations has been a very long step in the right direction." [Italics added.]  House Report, Volume 1, 64th Congress, 1st Session, Report No. 87, page 2.

[9] *United States* v. *Sandoval*, 231 U. S. 28, 46.

[10] Cf. *United States* v. *Pelican*, 232 U. S. 442, 450.

[11] *United States* v. *Sandoval, supra.*

ment as a "reservation" or "colony." In the case of *United States* v. *Pelican,* 232 U. S. 442, 449, this Court said:

"In the present case the original reservation was Indian country simply because *it had been validly set apart for the use of the Indians as such, under the superintendence of the Government.*" [Italics added.]

The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy. The Government has authority to enact regulations and protective laws respecting this territory.[12] ". . . Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States . . ." *United States* v. *Ramsey,* 271 U. S. 467, 471.

When we view the facts of this case in the light of the relationship which has long existed between the Government and the Indians—and which continues to date [13]—it is not reasonably possible to draw any distinction between this Indian "colony" and "Indian country." We conclude that § 247 of Title 25, *supra,* does apply to the Reno Colony.

2. The federal prohibition against taking intoxicants into this Indian colony does not deprive the State of Nevada of its sovereignty over the area in question. The Federal Government does not assert exclusive jurisdiction within the colony. Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments.[14]

[12] *Hallowell* v. *United States,* 221 U. S. 317; Constitution, Art. IV, Sec. 3, Cl. 2.

[13] Cf. Act of June 18, 1934, c. 576, 48 Stat. 984.

[14] See, *Hallowell* v. *United States, supra; Surplus Trading Co.* v. *Cook,* 281 U. S. 647.

540

Under the findings made by the District Court in this cause, a decree of forfeiture should have been rendered against the automobiles involved. The judgment of the Court of Appeals is reversed and the cause is remanded to the District Court for action to be taken in accordance with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.