U. S.

v.

**Alvin Ralph MOUND.**

U. S.

v.

**Orson Orville MOUND, Jr.**

U. S.

v.

**Amos Joshua COOK, III.**

U. S.

v.

**Joseph Dallas SPOTTED HORSE.**

CR. 79–30007–01, CR. 79–30018–01, CR. 79–30007–02, CR. 79–30018–02, CR. 79–30007–03, CR. 79–30018–03, CR. 79–30007–04 and 79–30018–04.

United States District Court, D. South Dakota, C. D.

Sept. 28, 1979.

---

Robert C. Riter, Jr., Riter, Mayer, Hofer & Riter, Pierre, S.D., for Alvin Ralph Mound.

David L. Bergren, Bergren & Duffy Law Offices, Fort Pierre, S.D. for Orson Orville Mound, Jr.

Thomas M. Maher, Pierre, S.D., for Amos Joshua Cook, III.

Harold H. Deering, Jr., May, Adam, Gerdes & Thompson, Pierre, S.D., for Joseph Dallas Spotted Horse.

Robert D. Hiaring, U.S. Atty., Sioux Falls, S.D., for United States.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

Defendants were indicted on March 6, 1979, for assault with a dangerous weapon and assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(c) and (f) and 18 U.S.C. § 1153. They were subsequently indicted again, on July 12, 1979, for first degree burglary arising from the same fact situation as the first indictment. The indictments were joined on August 2, 1979.

Questions about the jurisdiction of this Court over the crimes alleged in the indictment were raised in the affidavit supporting defendant Cook's Motion for Discovery dated June 8, 1979. A hearing was held on the question of jurisdiction on July 10, 1979. After due consideration of the evidence there submitted and the papers filed by the parties, this Court concludes that it does have jurisdiction over the geographical area in which the crimes allegedly occurred.

## LEGAL BACKGROUND

For the Court to have jurisdiction in this case under § 1153, the crime must have occurred in Indian Country as defined in one of the three sub-parts of § 1151. Here, the United States claims jurisdiction under subsection b of § 1151: "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of the state . . .".[1] The case law on the

---

[1] It is uncontested that the crime occurred within the original boundaries of the Cheyenne River Indian Reservation, which ordinarily would give this court jurisdiction under subsection a. However, *U. S. v. Juvenile*, 453 F.Supp. 1171 (D.S.D.1978), now on appeal, held that the

subject of just what is a dependent Indian community is exceptionally limited. The earliest case on the subject is *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), one of the sources of the statutory definition.

This case involved the Pueblo Indians, who lived in about twenty communities scattered throughout New Mexico on land held in communal, fee simple ownership by the Indians. In holding that these communities were subject to federal "guardianship and protection as dependent wards," 231 U.S. at 45, 34 S.Ct. at 5 and thus subject to a federal criminal statute prohibiting the introduction of liquor into Indian country, the Court noted that public monies had been expended for their benefit, agents and superintendents were provided, schools were established, and general improvements of their land for economic development were carried out.

The other source of § 1151(b) is *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), which considered whether the Reno Indian Colony in Nevada was Indian Country. The Court observed in that case that the purpose of creating the Colony was for the "protection of a dependent people," 302 U.S. at 538, 58 S.Ct. 286. After listing factors similar to those employed in *Sandoval*, that the Colony was "under the superintendence of the Government," that the United States retained "title to the lands which it permits the Indians to occupy"; and that the United States had "authority to enact regulations and protective laws respecting this territory", 302 U.S. at 539, 58 S.Ct. at 288, the Court concluded that the Colony was indeed a "dependent Indian community".

Following the codification of these cases in § 1151(b) in 1948, only one circuit court case has construed the statute. *United States v. Martine*, 442 F.2d 1022 (10th Cir. 1971) involved an area called the "Ramah community", which was "on land owned by the Navajo Tribe . . . having been purchased with tribal funds from a corpo-

rate owner." 442 F.2d at 1023. The court approved the trial court's practice of taking evidence "as to the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area." Id.

Finally, *Youngbear v. Brewer*, 415 F.Supp. 807 (N.D.Iowa 1976), aff'd 549 F.2d 74 (8th Cir. 1977) is also helpful for its holding that the "determination of whether lands are considered 'Indian Country' does not turn on the label used in designating them . . . nor on the manner in which the lands in question were acquired . . . Rather the test is whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples." 415 F.Supp. at 809.[2] With this precedent in mind, the court turns to the facts before it in this case.

## FACTUAL BACKGROUND

*Title to the Land.* The crimes in the two indictments are alleged to have taken place on December 26, 1978, at Cheyenne River Housing Authority project SD5–01 at Eagle Butte, South Dakota. Evidence presented at the hearing before this Court showed that the land where the project is located was originally allotted to individual members of the Cheyenne River Sioux Tribe and held in trust for them by the United States. The land was eventually purchased, in 1939, from its individual owners and has since been held in trust for the Tribe by the United States.

*Purpose of the Community.* The housing project had its source under Tribal Ordinance No. 28. By this Act, the Cheyenne River Sioux Tribe established a subordinate body, the Cheyenne River Housing Authority, to alleviate a problem of "insanitary, unsafe, and overcrowded dwelling accommodations." (It might be noted that the Authority is not a South Dakota charter corporation). The ordinance stated that the

---

Reservation had been diminished and made subsection a inapplicable.

2. *See also United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978).

"providing of decent, safe, and sanitary dwelling accommodations for persons of low income are . . . governmental functions of *Tribal concern*". (Emphasis supplied). The land involved here was leased by the Tribe to the Housing Authority for the purpose of "constructing and operating a low rent housing project", and the project was built with federal funds obtained through the Office of Indian Housing Programs of the United States Department of Housing and Urban Development.

*Relationship of the Community to the Tribe.* The Board of Commissioners of the Housing Authority is appointed by the Tribal Council, and may be removed by the Council for cause. Reflecting the Authority's status as an entity subordinate to the Tribe, the Board is required to report to the Tribal Council at periodic intervals. In addition, in Article VIII of Tribal Ordinance 28, the Tribe agreed, among other things, that no project of the Housing Authority would be subject to any Tribal property tax, that it would furnish the Authority and the occupants of its projects the same services as the Tribe furnished to other dwellings and inhabitants under its control, that it would modify Tribal codes to aid in the development of the projects, and that it would do anything within its legal powers to help construct or operate the projects. Of special interest here is the provision that "Tribal Courts shall have jurisdiction to hear and determine an action for eviction of a tenant or homebuyer."

*Relationship of the Community to the Federal Government.* Testimony at the hearing indicated that the United States Indian Health Service provides the water and sewers for the community, as well as medical services. The roads are the responsibility of the Bureau of Indian Affairs, and fire protection and the schools are provided through a joint agreement between the BIA and the town of Eagle Butte. School bus service is also combined between the Eagle Butte Independent School District and the BIA, but, according to the testimony, the BIA provides most of it.

*Practice of State Government Agencies Toward the Community.* Andrew Aberle, the States Attorney of Dewey County, where Eagle Butte is located, and who is also City Attorney of Eagle Butte, testified that in the time he had been States Attorney, he had always treated the housing project as though it were under federal jurisdiction. He had been made aware of the crimes charged in these indictments at the time they were committed, but did not investigate, feeling that the state had no power to do so.

*Composition of the Community.* The members of the Housing Authority Board, though appointed by the Tribe, are not required to be members of the Tribe. While several members of the Board have been non-Indians, all Board members are now, in fact, Indians.

Similarly, since the Authority is subject to HUD regulations, it may not discriminate on the basis of race in its renting. While the Court has no direct evidence on the numbers of Indians residing in low-rent Project SD5–01, it does have a list of the occupants on June 16, 1978, contained in the Housing Authority's annual report to the Tribe. Of the fifty-three heads of households, nineteen clearly have Indian names. Taking notice of the fact many Indians also have names of French extraction, at least another fifteen could probably be found to be Indian. Testimony at the hearing indicated that since the entire population of the community is somewhat transient, the exact percentage of Indian occupation is fluid, and that there are probably more Indians in the project now than at the time of the 1978 report.

## WHETHER EAGLE BUTTE HOUSING SITE SD5–01 IS A DEPENDENT INDIAN COMMUNITY?

Considering these facts against the statute and the case law, it seems clear that the housing project is indeed a dependent Indian community. As in *McGowan*, the title to the land is in the United States. The community has a close relationship with the Tribe, being given the same serv-

**160**

ices that the Tribe provides for its other communities, and is even under the jurisdiction of the Tribe for eviction purposes. *See Martine.* Similarly, the community has close ties with the federal government, *Sandoval, Martine,* with federal money spent for its benefit for water, sewer, roads, medical service, and a portion of its educational needs. The State of South Dakota has not attempted to exercise its jurisdiction over the community, at least during the tenure of the present States Attorney. *See Martine.*[3]

The main thrust of defendant's argument seems to be that since this community does not restrict its membership to Indians, and is unable to do so since built with HUD funds, and that because there are apparently a number of non-Indians in the community, this cannot be classified as an Indian community. This contention lacks merit. If this were a case under subsection a of 1151, the fact a non-Indian owned land inside the boundaries of a reservation would not make the reservation any less subject to federal jurisdiction. *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). This Court can conceive of no reason why taken by itself, the fact that there might be non-Indians in a dependent Indian community would defeat federal jurisdiction over that community. The crucial consideration here is "whether [the community has] been set apart for the use, occupancy and protection of dependent Indian peoples." On balance, this Court must say that this housing project meets this standard.

It is clear that when the Tribe authorized this project, it did so because of Tribal concern for the living conditions on the reservation. While people of other races who live in the area might be eligible for its services, the main beneficiaries of the project have to be considered to be the Indian members of the Cheyenne River Tribe. That the project is obliged to accept non-Indians in order to obtain HUD financing, and that these non-Indians are also eligible for all services provided the community, does not alter the fact that the special treatment given the community by the United States, through the BIA and the Indian Health Service, and the Tribe is given because of the community's predominantly *Indian* status.[4]

The test for determining what is a dependent Indian community must be a flexible one, not tied to any single talismanic standard such as percentage of Indian occupants. *See Youngbear.* The needs of Indian people must necessarily change with the years, and the method of supervision over them by the United States must change accordingly. As *McGowan* pointed out long ago, "Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out . . . ." 302 U.S. at 538, 58 S.Ct. at 287–288. It is not proper for this or any court to defeat the purpose behind § 1151(b) by giving it a rigid, narrow application.

Finding, then, that the evidence weighs strongly on the side of federal jurisdiction, this court concludes that this housing project is a dependent Indian community within the meaning of § 1151(b).

---

**3.** Even if, for the sake of argument, it were asserted that federal jurisdiction over this area had not been continuous, this would not mean that federal power over it has been destroyed. *United States v. John,* 437 U.S. 634, 653, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978).

**4.** *See,* generally, 25 U.S.C. §§ 1601, 1602 (Congressional goal given the Indian Health Service is to provide the "highest possible health status to *Indians* ") (Emphasis supplied); 25 U.S.C. § 2, (BIA's duty is "the management of all *Indian* affairs") (Emphasis supplied)