**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2015-NMSC-020**

**Filing Date:  June 25, 2015**

**Docket No. 34,122**

**STATE OF NEW MEXICO,**

 **Plaintiff-Petitioner,**

**v.**

**STEVEN B.,**

 **Child-Respondent.**

**CONSOLIDATED WITH**

**Docket No. 34,142**

**STATE OF NEW MEXICO,**

 **Plaintiff-Petitioner,**

**v.**

**ERNIE BEGAYE,**

 **Defendant-Respondent.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Grant L. Foutz, District Judge**

Hector H. Balderas, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jorge A. Alvarado, Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

1

for Respondent Steven B.

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Respondent Ernie Begaye

Damon P. Martinez, U.S. Attorney, District of New Mexico
Jonathon M. Gerson, Assistant U.S. Attorney
Albuquerque, NM

for Amicus Curiae United States

The Navajo Nation Department of Justice
Harrison Tsosie, Attorney General
Paul W. Spruhan, Assistant Attorney General
Window Rock, AZ

for Amicus Curiae The Navajo Nation

**OPINION**

**MAES, Justice.**

**{1}**     In this consolidated appeal, Respondents Steven B. and Ernie Begaye (Respondents), are both enrolled members of the Navajo Nation who stand accused of offenses committed on Parcel Three of Fort Wingate (Parcel Three). The question presented is whether Parcel Three is a dependent Indian community—and therefore Indian country—under 18 U.S.C. § 1151(b) (2012) and *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998). If so, then the district court properly concluded that it lacked jurisdiction over Respondents. *See State v. Quintana*, 2008-NMSC-012, ¶ 4, 143 N.M. 535, 178 P.3d 820 ("In general, 'a state does not have jurisdiction over crimes committed by an Indian in Indian country.'" (quoting *State v. Frank*, 2002-NMSC-026, ¶ 12, 132 N.M. 544, 52 P.3d 404)). If not, then we must reverse the district court and permit the State to proceed against Respondents.

**{2}**     We are not the first court to consider the Indian country status of Parcel Three. More than a decade-and-a-half ago, the Court of Appeals in *State v. Dick* held that Parcel Three is a dependent Indian community and ordered the dismissal of a DWI prosecution due to a lack of state jurisdiction. *See* 1999-NMCA-062, ¶ 28, 127 N.M. 382, 981 P.2d 796, *cert. granted*, 127 N.M. 391, 981 P.2d 1209 (1999), *cert. quashed,* 129 N.M. 208, 4 P.3d 36 (2000). Four years later, the U.S. District Court for the District of New Mexico reached the opposite conclusion in *United States v. M.C.*, holding that Parcel Three is *not* a dependent

2

Indian community and dismissing an indictment for second-degree murder due to a lack of *federal* jurisdiction. *See* 311 F. Supp. 2d 1281, 1282, 1297 (D.N.M. 2004).

**{3}** Faced with these contradictory rulings, the district court determined that *Dick* was controlling and dismissed the proceedings against Respondents. The Court of Appeals affirmed, and the State now urges this Court to overrule *Dick* and to reverse. We review the controlling case law, the history, and the present circumstances of Parcel Three, and conclude that *Dick* was wrongly decided and must be overruled. Parcel Three is not a dependent Indian community, and the district court, therefore, has jurisdiction over Respondents. The district court and the Court of Appeals having concluded otherwise, we reverse.

## I.      FACTS AND PROCEDURAL HISTORY

**{4}** The facts leading to these consolidated appeals are not in dispute. Respondents are enrolled members of the Navajo Nation who were charged with offenses which, if proven, were committed on Parcel Three. Respondent Steven B., a child, is the subject of a petition alleging that he committed the delinquent act of battery against a school official at Wingate High School, contrary to NMSA 1978, Sections 30-3-9(E) (1989) and 32A-2-3(A) (2009). Respondent Begaye was charged in an unrelated proceeding with 11 counts of criminal sexual penetration of a child under 13 years of age, contrary to NMSA 1978, Section 30-9-11(D)(1) (2009), and with 14 counts of criminal sexual contact of a minor on a child under 13 years of age, contrary to NMSA 1978, Section 30-9-13(B)(1) (2003). The criminal sexual penetration and criminal sexual contact allegedly occurred in the staff housing area of the Wingate school campus. The alleged victims in both proceedings were non-Indians.

**{5}** Respondents moved to dismiss the proceedings for lack of state jurisdiction, arguing that Parcel Three is a dependent Indian community and therefore Indian country as held in *Dick*. The State acknowledged that *Dick* was controlling, but argued that the courts should revisit the status of Parcel Three in light of the federal district court's contrary holding in *M.C.* The parties entered into stipulated findings of fact and conclusions of law, including the State's concession that the district court was bound by *stare decisis* to follow *Dick*, and after an evidentiary hearing, the district court granted Respondents' motions to dismiss.

**{6}** The State appealed both rulings, arguing that *Dick* was wrongly decided and that it should be overruled. The Court of Appeals considered the federal district court's reasoning in *M.C.* and declined to overrule *Dick*. *See State v. Steven B.*, 2013-NMCA-078, ¶¶ 14-15, 306 P.3d 509. As a result, the Court affirmed the dismissals of the proceedings against Respondents. *See id.* ¶ 16; *State v. Begaye*, No. 32,136, mem. op., ¶ 4 (N.M. Ct. App. Apr. 9, 2013) (non-precedential) ("*Steven B.* controls this appeal."). We granted certiorari in both cases and consolidated the proceedings to settle for our state courts the question of Parcel Three's status as a dependent Indian community.

## II.     STANDARD OF REVIEW

**{7}**     "Questions regarding subject matter jurisdiction 'are questions of law which are subject to de novo review.'" *State v. Chavarria*, 2009-NMSC-020, ¶ 11, 146 N.M. 251, 208 P.3d 896 (quoting *State v. Montoya*, 2008-NMSC-043, ¶ 9, 144 N.M. 458, 188 P.3d 1209). This Court defers to a district court's factual determinations "if such findings are supported by substantial evidence." *Frank*, 2002-NMSC-026, ¶ 10 (internal quotation marks and citation omitted).  Because the State does not contest the facts found by the district court, we review de novo whether the district court correctly applied the law to the facts, viewing the facts in the manner most favorable to Respondents as the prevailing parties. *Id.*

## III.     DISCUSSION

### A.     The issue before us is the type of "use" for which lands must be set aside by the federal government to support a finding of a dependent Indian community

**{8}**     Though the ultimate question in this appeal is whether Parcel Three is a dependent Indian community, the parties and the district court below have narrowed the issue significantly. To frame the precise question before us, we pause to review some basic principles and to summarize the disagreement between *Dick* and *M.C.*

**{9}**     We first explained in *Blatchford v. Gonzales* that a dependent Indian community is one of three categories of land that Congress has defined as Indian country for purposes of criminal jurisdiction. *See* 1983-NMSC-060, ¶¶ 7, 8, 100 N.M. 333, 670 P.2d 944 (citing 18 U.S.C. § 1151 (1976), which defines Indian country as Indian reservations, dependent Indian communities, and Indian allotments). The phrase dependent Indian community originated in federal common law and was adopted as part of the statutory definition of Indian country in 1948 when Congress enacted § 1151. *See Blatchford,* 1983-NMSC-060, ¶ 9 (noting that the dependent Indian community language in § 1151(b) stemmed from *United States v. Sandoval*, 231 U.S. 28 (1913), and *United States v. McGowan*, 302 U.S. 535 (1938)).

**{10}**     To determine if a particular tract of land is a dependent Indian community, we apply the two-prong test articulated by the U.S. Supreme Court in *Venetie*: "for the land in question to be a dependent Indian community, it must satisfy two requirements: (1) it 'must have been set aside by the Federal Government for the use of the Indians as Indian land[,]' and (2) it 'must be under federal superintendence.'" *Quintana*, 2008-NMSC-012, ¶ 4 (alteration in original) (quoting *Venetie*, 522 U.S. at 527). If the land at issue fails to meet *either* prong, it is not a dependent Indian community. *See Quintana*, 2008-NMSC-012, ¶ 8 (declining to consider whether the land in question was under federal superintendence because the Court had already concluded that it failed to meet the set-aside prong).

**{11}**     The district court below, with the State's concession, found that Parcel Three is administered by the Bureau of Indian Affairs (BIA) and therefore meets *Venetie*'s federal

4

superintendence prong. That conclusion is not challenged on appeal.[1] Thus, to determine whether Parcel Three is a dependent Indian community, we must answer only whether Parcel Three satisfies the first prong of the *Venetie* test, whether it was "set aside by the Federal Government for the use of the Indians as Indian land." *Venetie*, 522 U.S. at 527.

{12}    But our inquiry is narrower still. In our most recent opinion to address the set-aside requirement, we explained that *Venetie* requires "some explicit action taken by Congress or the Executive to create Indian country." *Quintana*, 2008-NMSC-012, ¶ 6. Our cases have shown that failing the first part of this requirement—the need for "some explicit action taken by Congress or the Executive"—can be dispositive such that a tract is not a dependent Indian community. *See id.* ¶¶ 2, 6 (holding that State Road 16, which separates the Santo Domingo and Cochiti Pueblos and is located on land owned by the federal government and administered by the U.S. Forest Service, is not a dependent Indian community because "there is no evidence of any explicit congressional or executive action recognizing State Road 16 as Indian country"); *Frank*, 2002-NMSC-026, ¶¶ 4, 11, 23 (holding that a state road located on federally owned and administered land within a "checkerboard area" was not a dependent Indian community because there was "'no evidence . . . indicating that the area in question was set aside by the Federal Government for the exclusive use of Indians'" (alteration in original) (quoting the district court's findings of fact and conclusions of law)); *see also State v. Vandever*, 2013-NMCA-002, ¶ 16, 292 P.3d 476 (holding that land owned in fee simple by the Navajo Nation was not a dependent Indian community because "[t]here was no evidence . . . to establish either that the federal government took some explicit action to designate the land as Indian country or that the federal government transferred the property to Indians for use by Indians").

{13}    Parcel Three does not suffer from this shortcoming. The district court found based upon the parties' stipulated facts that Parcel Three was transferred from the Department of Defense to the Department of Interior "for use by the Bureau of Indian Affairs" in 1950 by an act of Congress. We therefore assume for the purposes of these appeals that the transfer of Parcel Three to the BIA was the type of "explicit action" that we have found lacking in previous cases to meet *Venetie*'s set-aside requirement. *See, e.g.*, *Quintana*, 2008-NMSC-012, ¶ 6.

{14}    Which brings us to the heart of the matter. The precise question before us is whether the 1950 transfer of Parcel Three set the land aside "*for the use of the Indians as Indian land.*" *Venetie*, 522 U.S. at 527 (emphasis added); *see also Quintana*, 2008-NMSC-012, ¶ 6 (holding that a valid set-aside under *Venetie* requires "some explicit action taken by

---

[1]The United States, as amicus curiae, disputes that the BIA's oversight of Parcel Three is the type of federal superintendence necessary to meet the *Venetie* test. However, the district court explicitly concluded that Parcel Three is under federal superintendence for the purposes of *Venetie*, a conclusion that the State does not challenge on appeal. We therefore do not reach the issue.

Congress or the Executive *to create Indian country*" (emphasis added)). The parties disagree, as did the courts in *Dick* and *M.C.*, over the type of "use" that is sufficient to meet the set-aside requirement. The State argues, consistent with *M.C.*, that a dependent Indian community must be located on lands set aside for "permanent inhabitation [by] a distinct group of Indians." *See* 311 F. Supp. 2d at 1295 ("[T]here has never been a finding of a dependent Indian community unless the community at issue was located on tribal lands or land held in trust for Native Americans."). Respondents, by contrast, argue that *Dick* correctly held that inhabitation, though sufficient to meet the set-aside requirement, is not necessary and that the requirement is met when lands are set aside simply for "Indian use." *See* 1999-NMCA-062, ¶ 21 ("Although the cases relied upon by *Venetie* and *Venetie* itself address lands that were allotments, villages, reservations, or otherwise home to Indians, there is no indication that the set-aside requirement is so limited.").

**{15}** We first undertake our own analysis of the origin and development of the term dependent Indian community to determine the type of "use" necessary for a finding of Indian country. We then turn to the particular circumstances of Parcel Three to determine if it was set aside "for the use of the Indians as Indian land." *Venetie*, 522 U.S. at 527.

**B.     The cases culminating in *Venetie* limit Indian country to land set aside for "use" as a long-term settlement by an Indian community**

**{16}** The term dependent Indian community originated in *Sandoval*, which was one of a trio of U.S. Supreme Court opinions in the early twentieth century that refined the federal definition of Indian country. *See Sandoval*, 231 U.S. 28; *see also United States v. Pelican*, 232 U.S. 442 (1914); *Donnelly v. United States*, 228 U.S. 243 (1913). Those cases, beginning with *Donnelly* and followed by *McGowan* and *Venetie*, provide critical factual and legal context for the question presented in this appeal. We therefore review the *Donnelly* line of cases before turning to our analysis of *Dick* and the status of Parcel Three.

**1.     The *Donnelly* line of cases informs the meaning of Indian country under 18 U.S.C. § 1151**

**{17}** Before Congress enacted § 1151 in 1948, it had last defined Indian country in the 1834 Indian Trade and Intercourse Act as follows:

> That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for purposes of this act, be taken and deemed to be the Indian country.

Act of June 30, 1834, ch. 161, § 1, 4 Stat. 729. This geographical definition soon became unworkable with the nation's rapid expansion westward following the acquisition of California and other western territories as a result of the Mexican-American War. *See* Joseph

D. Matal, *A Revisionist History of Indian Country*, 14 Alaska L. Rev. 283, 294 (1997) ("The Mexican-American War of 1846-48 forced a change in thinking."). As the United States embraced its "manifest destiny" and encouraged settlement from coast to coast, the federal government began to relocate Indians onto tribal reservations within organized states and territories. *See, e.g.*, *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72 (1962) ("As the United States spread westward, it became evident that there was no place where the Indians could be forever isolated."). Having become obsolete, the 1834 definition of Indian country was effectively repealed when it was omitted from the U.S. Code in 1874. *See* 18 Stat. 1091, tit. 74 (1874) (deleting the definition of Indian country in Rev. Stat. § 5596 (1873)); *see also* *Clairmont v. United States*, 225 U.S. 551, 557 (1912) (explaining that the 1834 definition of Indian country "was not re-enacted in the Revised Statutes, though other parts of the statute were, and hence was repealed by § 5596 of the revision").

**{18}** With no statutory definition of Indian country, the courts took up the task of formulating a common law definition in light of "the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country, where it is spoken of in the statutes." *Ex parte Kan-gi-shun-ca (otherwise known as Crow Dog)*, 109 U.S. 556, 561 (1883). In an early effort, the Supreme Court characterized Indian country as "all lands 'to which the Indian title has not been extinguished,' and which were either outside 'the exterior geographical limits of a state' or 'excepted from its jurisdiction . . . at the time of its admission.'" Matal*, supra*, at 301 (omission in original) (quoting *Ex parte Kan-gi-shun-ca*, 109 U.S. at 561). That definition, based on aboriginal title, would stand more-or-less undisturbed until the Court decided *Donnelly*, *Pelican*, and *Sandoval*.

**{19}** In *Donnelly*, the Supreme Court considered whether to reverse a federal conviction for the murder of an Indian within the boundaries of an Indian reservation in northern California. *See* 228 U.S. at 252. One of the arguments for reversal was that the reservation was not Indian country because it was located on lands that were "set apart as an Indian reservation out of the public domain, and not previously occupied by the Indians." *See id.* at 268. The Court rejected that argument, reasoning that Indian country was no longer limited to a tribe's aboriginal lands:

> "[T]he changes which have taken place in our situation" are so numerous and so material, that the term ["Indian country"] cannot now be confined to land formerly held by the Indians, and to which their title remains unextinguished. And, in our judgment, nothing can more appropriately be deemed "Indian country" . . . than a tract of land that, being a part of the public domain, is lawfully set apart as an Indian reservation.

*Id.* at 269 (quoting *Clairmont*, 225 U.S. at 557). *Donnelly*, therefore, clarified that Indian country includes land set aside as a reservation, even when the land was not "previously occupied by the Indians." *See Id.* at 268-69.

7

**{20}**     In *Pelican*, the Supreme Court considered whether an 80-acre tract of land, which previously had been part of the Colville Reservation, remained Indian country after the land had been allotted to "Agnes, an Indian," and held in trust by the United States for Agnes for a period of 25 years. *See* 232 U.S. at 444-47. The lower court had concluded that the allotment was not Indian country and, therefore, had dismissed a pair of federal indictments for an alleged murder that had occurred on the allotment. *See id.* at 444-45. The Supreme Court reasoned that the allotment continued to be Indian country even after the original reservation was diminished because the lands "still retain during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by Federal legislation." *Id.* at 449. *Pelican* thus clarified that Indian country includes, in addition to reservations, land allotted for "Indian occupancy" and held in trust by the federal government. *See id.* at 449-51 ("[M]eanwhile, [during the trust period,] the lands remained Indian lands, set apart for Indians under governmental care . . . .").

**{21}**     In between *Donnelly* and *Pelican*, the Supreme Court in *Sandoval* considered a third category of lands, Pueblo lands, which were neither a formal reservation nor an allotment. *See Sandoval*, 231 U.S. at 38-39 (describing the lands in question as "held in communal, fee simple ownership under grants from the King of Spain, made during the Spanish sovereignty, and confirmed by Congress since the acquisition of [the New Mexico] territory by the United States."). The lower court had dismissed an indictment for "introducing intoxicating liquor into the Indian country" after concluding that a pair of statutes that defined Pueblo lands as Indian country were an invalid exercise of Congressional authority. *See id.* at 36-37. The Supreme Court first concluded that Congress not only has plenary authority over "commerce with the *Indian tribes*," but also has "the power and the duty of exercising a fostering care and protection over all *dependent Indian communities* within its borders." *Id.* at 45-46 (emphasis added). The Court then concluded that the "Pueblos of New Mexico" are such dependent communities, "entitled to [the federal government's] aid and protection, like other Indian tribes." *Id.* at 47. As a result of that "guardianship," the Court held that the lands "owned or occupied by the Pueblo Indians" were Indian country, regardless of being owned in fee simple by "the Indians of each [P]ueblo." *Id.* at 37, 48.

**{22}**     Thus, to the extent that *Sandoval* used the term dependent Indian community to refine the common law definition of Indian country, it is more accurate to say, not that a dependent Indian community itself is Indian country, but that the *land* "owned or occupied" by a dependent Indian community is Indian country. *See United States v. Chavez*, 290 U.S. 357, 362 (1933) ("In *United States v. Sandoval*, this court, after full examination of the subject, held that the status of the Indians of the several pueblos in New Mexico is that of dependent Indian tribes under the guardianship of the United States, and that by reason of this status they and their lands are subject to the legislation of Congress enacted for the protection of tribal Indians and their property." (citation omitted)).

**{23}**     Some 25 years after *Sandoval*, the Supreme Court revisited its definition of Indian country in *McGowan*. The *McGowan* court considered whether the Reno Indian Colony, "composed of several hundred Indians residing on a tract of 28.38 acres of land owned by

the United States," was Indian country. 302 U.S. at 537. Noting that Congress's intent in creating the colony was "to provide lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a permanent settlement," the Court reasoned that Congress had "afforded [Indians in the colony] the same protection by the government as that given Indians in other settlements known as 'reservations.'" *Id.* at 537-38. The Court, therefore, held that, whether designated a reservation or a colony, the tract was Indian country because the colony had been "validly set apart for the use of the Indians"; was "under the superintendence of the government"; and was located on land that was titled in the government and that the government permitted the Indians to occupy. *Id.* at 539. *McGowan* therefore signaled that lands set aside by the federal government for settlement by a dependent Indian community—regardless of the label attributed to such lands or to the community itself—are Indian country.

**{24}** With these cases as a backdrop, Congress in 1948 set forth the current definition of Indian country, recognizing the three categories of lands at issue in *Donnelly*, *Pelican*, *Sandoval*, and *McGowan*:

> [T]he term "Indian country," as used in this chapter, means (a) all land within the limits of any *Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all *Indian allotments*, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (1948) (emphasis added). The *Donnelly* line of cases therefore provides context for courts construing the statutory definition of Indian country, including whether land is a dependent Indian community. *See* 18 U.S.C. § 1151 Historical and Statutory Notes (explaining that the definition of Indian country "is based on [the] latest construction of the term by the United States Supreme Court in *U.S. v. McGowan*, following *U.S. v. Sandoval*" and that "Indian allotments were included in the definition on authority of the case of *U.S. v. Pelican*" (citations omitted)).

**{25}** And it was to these cases that the U.S. Supreme Court looked in *Venetie*, 50 years after Congress enacted § 1151, when the Court first interpreted the phrase dependent Indian community as used in the statute. In *Venetie*, the Court considered whether 1.8 million acres of land owned in fee simple by the Native Village of Venetie Tribal Government was a dependent Indian community. *See* 522 U.S. at 523-24. The land had been a reservation until Congress revoked the reservation status of nearly all Alaskan reservations and extinguished aboriginal claims to all Alaskan lands in exchange for the transfer of nearly 1 billion dollars and 44 million acres of land to a collection of private corporations owned exclusively by Alaska Natives. *See id.* at 524 (discussing the Alaska Native Claims Settlement Act

9

(ANCSA), 43 U.S.C. § 1601 to -1629h, 85 Stat. 688 (1971)). The Ninth Circuit had applied a six-factor balancing test and concluded that the land was a dependent Indian community under § 1151. *See Venetie*, 522 U.S. at 525-26.

**{26}** Reversing, the Supreme Court disapproved of the Ninth Circuit's multi-factor test and instead identified from its case law two irreducible requirements for determining whether lands are a dependent Indian community: "first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." 522 U.S. at 527. The Court drew these requirements from the *Donnelly* line of cases, reasoning that "in enacting § 1151, Congress codified these two requirements, which previously we had held necessary for a finding of 'Indian country' generally." *Venetie*, 522 U.S. at 527. It further explained the requirements' significance as they relate to a dependent Indian community in particular:

> The federal set-aside requirement ensures that the land in question is occupied by an "Indian community"; the federal superintendence requirement guarantees that the Indian community is sufficiently "dependent" on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question.

*Id.* at 531 (footnote omitted).

**{27}** The Supreme Court then applied its two-factor test to the lands owned by the Village of Venetie. With respect to the set-aside prong, the Court held that the revocation of the Venetie Reservation and subsequent transfer of the lands in fee simple to the privately owned corporations, without restraints on alienation or use restrictions, precluded a finding that the lands had been set aside as Indian lands. *See id.* at 532-33. The Court then concluded that the lands failed the superintendence prong because Congress explicitly intended to "avoid a lengthy wardship or trusteeship" and had left in place only minimal protections for the lands transferred to the Alaska Natives. *Id.* at 533 (internal quotation marks and citation omitted) (noting that "the land is exempt from adverse possession claims, real property taxes, and certain judgments as long as it has not been sold, leased, or developed"). Because the land failed both requirements, the Court held that it was not a dependent Indian community. *See id.* at 532.

**{28}** Thus, *Venetie* looked past the labels in § 1151 and set forth a functional definition of Indian country, including dependent Indian communities. *See also* Felix S. Cohen, *Felix S. Cohen's Handbook of Federal Indian Law 1982 Edition* 39 (Rennard Stickland et al. eds., 1982) ("Read together, 18 U.S.C. §§ 1151(a) and (b) employ a functional definition focusing on the federal purpose in recognizing or establishing a reasonably distinct location for the residence of tribal Indians under federal protection."). Whether termed a reservation, community, Pueblo, allotment, or colony, *Venetie* held that Indian country is limited to lands that meet its two-part test, as informed by the opinions upon which *Venetie* relied. *See* 522

U.S. at 530 ("Section 1151 does not purport to alter this definition of Indian country, but merely lists the three different categories of Indian country mentioned in our prior cases . . . ."). With this context in mind, we turn to the question of the "use" necessary to support a finding of a dependent Indian community.

## 2. *Dick*'s interpretation of the set-aside prong is inconsistent with precedent and is overruled

**{29}**     The Court of Appeals in *Dick* considered the *Donnelly* line of cases and concluded that, "[a]lthough the cases relied upon by *Venetie* and *Venetie* itself address lands that were allotments, villages, reservations, or otherwise home to Indians, there is no indication that the set-aside requirement is so limited." 1999-NMCA-062, ¶ 21. *Dick* also rejected the argument—similar to the State's argument in the present appeals—that *Venetie* requires the land to be "set aside for an Indian residential community or settlement." *See* 1999-NMCA-062, ¶¶ 20-21. Instead, the Court held that *Venetie* requires only that the land be "set aside for Indian use." *Dick*, 1999-NMCA-062, ¶ 21. The Court reasoned that, because *McGowan* and *Pelican* had both held that lands other than reservations were Indian country, the U.S. Supreme Court "could not have meant that land had to be set-aside as reservation-type land. Otherwise, there would have been no need for the passage of Section 1151, which separately discusses reservations, allotments, and dependent Indian communities." *Dick*, 1999-NMCA-062, ¶ 22.

**{30}**     We view this as a misreading of *Venetie* and the cases leading to the enactment of § 1151. Based on our review, the terms reservation, dependent Indian community, and allotment were born from an era in which criminal jurisdiction over crimes committed in Indian country was being tested by defendants on technical, and even semantic, grounds. *Cf. State v. Frank*, 2001-NMCA-026, ¶ 35, 130 N.M. 306, 24 P.3d 338 (Bosson, C.J., dissenting) ("[W]e should be mindful that the provocateur of this conflict is not the tribe, but a skillful defense attorney hoping to avoid prosecution by playing off the jurisdictional aspirations of each against the other."), *rev'd*, 2002-NMSC-026, 132 N.M. 544, 52 P.3d 404. Without a then-current definition of Indian country, defendants made a series of arguments premised on the idea that the federal government lacked jurisdiction over lands that deviated from historical definitions of Indian country.

**{31}**     In dispelling these arguments, the U.S. Supreme Court first concluded, "not surprisingly," that Indian country includes lands set aside as reservations, even when they were not the ancestral lands of a particular Tribe. *See Venetie*, 522 U.S. at 528 n.3 (citing *Donnelly*, 228 U.S. at 269). The Court then clarified that Indian country includes lands, though not formally set aside as a reservation, that are set aside for ownership and occupation by a dependent Indian community—in that case, the Santa Clara Pueblo. *See Sandoval*, 231 U.S. at 36. Next, the Court held that Indian country encompasses land that previously had been part of a reservation and that was later allotted to a particular Indian for "Indian occupancy," at least during the period that the land was held in trust by the federal government. *See Pelican*, 232 U.S. at 449-50. And finally, the Court held that an Indian

11

"colony," regardless of its label, is Indian country because it meets the requirements of Indian country generally, including that it was set aside for settlement by a dependent Indian community. *See McGowan*, 302 U.S. at 539.

**{32}** After Congress codified these three categories of Indian country in § 1151, *Venetie* clarified that they are merely variations on the functional definition of Indian country that the Court had drawn from its earlier cases:

> In each of these cases . . . we relied upon a finding of both a federal set-aside and federal superintendence in concluding that the Indian lands in question constituted Indian country and that it was permissible for the Federal Government to exercise jurisdiction over them. Section 1151 does not purport to alter this definition of Indian country, but merely lists the three different categories of Indian country mentioned in our prior cases: Indian reservations, see *Donnelly v. United States*; dependent Indian communities, see *United States v. McGowan*; *United States v. Sandoval*; and allotments, see *United States v. Pelican*.

*See* 522 U.S. at 530 (citations omitted).

**{33}** Thus, while the three categories listed in § 1151 may have different labels and particular features of ownership, we disagree with the Court of Appeals that Indian country is not limited to lands that serve as "home to Indians." *Dick*, 1999-NMCA-062, ¶ 21. To the contrary, a unifying feature of the lands from which those categories were drawn is that they were set aside for a singular "use": the long-term settlement of an Indian community. *See McGowan*, 302 U.S. at 537 (noting that Congress's intent in creating the Reno Indian colony was "to provide lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a *permanent settlement*" (emphasis added)); *Sandoval*, 231 U.S. at 39 (holding that Pueblo lands were Indian country when Congress had confirmed the land grants made to the Pueblo Indians by the King of Spain and that adjacent lands had been "reserved by Executive orders for the *use and occupancy* of the Indians" (emphasis added)); *see also Pelican*, 232 U.S. at 449 (holding that the allotted lands "still retain during the trust period a distinctively Indian character, being devoted to Indian *occupancy* under the limitations imposed by Federal legislation" (emphasis added)); *Donnelly*, 228 U.S. at 255 (noting that Congress had set the lands "for the purposes of Indian Reservations, which shall be of suitable extent for the accommodation of the Indians of said state" (quoting Act of April 8, 1864, § 2, 13 Stat. at L. 39, chap. 48)); *cf. Venetie*, 522 U.S. at 532-33 (holding that the lands had not been set aside for use as Indian lands when the federal government had transferred the lands to Native-owned corporations without restraints on alienation or use restrictions).

**{34}** In holding that *Venetie* requires that lands be set aside merely for "Indian use," the Court of Appeals in *Dick* strayed beyond the factual underpinnings that gave rise to § 1151. We decline to do the same, particularly when neither the parties nor the amici curiae in these

proceedings have cited another instance of a court taking a similarly expansive view of the set-aside requirement. We therefore conclude that the "use" envisioned by Congress when it enacted § 1151(b) was the sort of occupancy associated with long-term settlement by an Indian community.

**{35}** We note that the outcomes in our previous cases applying *Venetie* are consistent with our conclusion. *See Quintana*, 2008-NMSC-012, ¶¶ 2, 6-7 (holding that a state road separating the Santo Domingo and Cochiti Pueblos and located on land owned by the federal government and administered by the U.S. Forest Service did not meet *Venetie*'s set-aside requirement); *State v. Romero*, 2006-NMSC-039, ¶¶ 2-3, 15, 140 N.M. 299, 142 P.3d 887 (holding that privately owned fee lands within the boundaries of the Taos and Pojoaque Pueblos were properly set aside under *Venetie* "by congressional acts recognizing pueblo land"); *Frank*, 2002-NMSC-026, ¶¶ 4, 11, 23 (holding that a state road located on federally owned and administered land within a "checkerboard area" was not a dependent Indian community because there was "'no evidence . . . indicating that the area in question was set aside by the Federal Government for the exclusive use of Indians'" (quoting the district court's findings of fact and conclusions of law)); *see also Vandever*, 2013-NMCA-002, ¶ 16 (holding that land owned in fee simple by the Navajo Nation was not a dependent Indian community because "[t]here was no evidence presented to the district court to establish either that the federal government took some explicit action to designate the land as Indian country or that the federal government transferred the property to Indians for use by Indians").

**{36}** Thus, *Dick* is an outlier, and we therefore overrule its conclusion that transferring land to the BIA merely for "Indian use" satisfies *Venetie*'s set-aside requirement. We also modify any previous cases that have restated or approved of *Dick*'s holding in their discussion of *Venetie*'s set-aside requirement. *See, e.g.*, *Quintana*, 2008-NMSC-012, ¶ 6 (relying on *Dick* in dicta for the premise that transferring land for Indian use or to the BIA is sufficient to meet the set-aside prong of *Venetie*). Having identified the "Indian use" contemplated by *Venetie*, we now must decide if Parcel Three was set aside for long-term settlement by an Indian community.

## C. Congress set aside Parcel Three for use by the BIA, not for long-term settlement by an Indian community

**{37}** The parties agree that the facts related in *Dick* and in *M.C.* about Fort Wingate and Parcel Three remain largely unchanged. Although we are primarily concerned with the original purpose for which the land was set aside, we recount the land's history and present circumstances in some detail to illustrate the interests of the parties and amici curiae involved in these proceedings.

**{38}** Fort Wingate is located on land that was historically inhabited by the Navajo people, though not exclusively. The Treaty with the Navajo of 1868 extinguished the "Navajo tribe's" aboriginal title to certain lands (including the land that would later become Fort

13

Wingate) and set aside land to be occupied exclusively by the Navajo. *See* Treaty with the Navajo, 1868, 15 Stat. 667 (1868). In 1870 and 1881, the federal government designated 130 square miles of the formerly Navajo lands as a military reservation, now referred to as Fort Wingate. *See Dick*, 1999-NMCA-062, ¶ 3.

**{39}**    Today, Fort Wingate is split into four parcels, each of which is administered separately by the federal government. Parcel One, an area referred to as the Iyanbito, is held in trust by the federal government for the Navajo Nation and administered by the BIA. *See M.C.*, 311 F. Supp. 2d at 1282. Parcel Two remains the Fort Wingate military reservation, under the control of the Department of Defense. Parcel Three, the subject of this appeal, is administered by the BIA.  And Parcel Four is under the jurisdiction of the U.S. Forest Service, having been transferred to the Cibola National Forest by an Executive Order dated 1925.

**{40}**    Congress created Parcel Three in 1950 when it enacted Public Law 567, which transferred 13,150 acres of Fort Wingate "to the Department of the Interior, for use by the Bureau of Indian Affairs." Act of June 20, 1950, Pub. L. No. 81-567, 64 Stat. 248. Public Law 567 provides,

> That the Secretary of the Army is hereby authorized and directed to transfer to the Department of the Interior, for use by the Bureau of Indian Affairs, that portion of the Fort Wingate Military Reservation, New Mexico, comprising approximately thirteen thousand one hundred and fifty acres, heretofore determined to be surplus to the requirements of the Department of the Army. Title to the land so transferred shall remain in the United States for the use of Bureau of Indian Affairs.

**{41}**    The BIA continues to retain authority over the lands set aside in Public Law 567 with two exceptions. First, Congress transferred nearly 7,000 acres of Parcel Three to the Forest Service in 1972. *See* Act of Oct. 6, 1972, Pub. L. No. 92-465, 86 Stat. 777, 779. And second, the BIA sold 16 acres of Parcel Three in 1990 to Paul Merrill (the Merrill property), a private individual, after determining that the land exceeded its needs. The Merrill property currently is the site of a trailer park, apartments, a restaurant, a pawn shop/trading post, a convenience store, a gas station, and a post office that are used by the general public and by local Indian residents.

**{42}**    Parcel Three is administered by the BIA for the primary purpose of educating Indian children. *See Dick*, 1999-NMCA-062, ¶14. The BIA operates two schools on Parcel Three, Wingate Elementary School and Wingate High School (the Wingate Schools). Enrollment at the Wingate Schools is not limited exclusively to Indian children; qualified non-Indian children are permitted to attend. However, at the time of the stipulated facts in the cases below, all of the students who attended the Wingate Schools were Indian, and the vast majority were Navajo.

14

**{43}** Other than the housing on the privately owned Merrill property, Parcel Three offers no living arrangements or establishments besides those provided by the BIA for student dormitories and school-employee family housing. Residence on Parcel Three is conditioned entirely upon an educational or employment relationship with the schools. Approximately 75% of the students who attend Wingate High School live on campus, and 50% of the students who attend Wingate Elementary School live on campus. Approximately 85% of the employees who live on campus are Indian.

**{44}** Administration and oversight of the Wingate Schools is a shared enterprise between the Navajo Nation, the BIA, and the State. The schools' Board is elected at Navajo Nation elections and determines school policies, the curriculum, and the budget; the BIA has the power to overturn the Board's decisions and employs the schools' principals; and the schools comply with all New Mexico state education requirements, including requirements for teacher licensure.

**{45}** Similarly, the Navajo Nation and various levels of state, county, and city government collaborate to provide emergency and other support services to the residents of Parcel Three. Emergency telephone calls requesting police, fire, or medical services are directed to and received by McKinley County Metro Dispatch, an organization funded by McKinley County and the City of Gallup. Emergency law enforcement services are provided by the Navajo Nation, the McKinley County Sheriff's Office, and the New Mexico State Police. All utilities, including telephone services, electricity services, natural gas services, water and sewer services, and waste disposal services, are provided by non-Indian entities. Thus, Parcel Three is the subject of a cooperative approach between federal, state, local, and Navajo governments to provide for the safety and welfare of the people who are permitted by the BIA to reside at the Wingate Schools.

**{46}** To answer the question before us, however, our primary focus is on Public Law 567, which offers the clearest indication of Congress's intended use for Parcel Three. As previously noted, Public Law 567 transferred Parcel Three "to the Department of the Interior, for use by the Bureau of Indian Affairs." 64 Stat. 248. This language, enacted just two years after Congress adopted the definition of Indian country in § 1151, does not purport to create Indian country or refer to any of the three categories of Indian country listed in § 1151. Nor does Public Law 567 invoke any other badge of Indian country from the *Donnelly* line of cases, such as transferring title of Parcel Three to a group or community of Indians, *see Sandoval*, 231 U.S. at 39, or establishing a trust relationship with or providing for the protection of an Indian Tribe, Indian individual, or other Indian community that owns or occupies the land, *see id.*; *McGowan*, 302 U.S. at 537; *Pelican*, 232 U.S. at 447. Public Law 567 provides only that "[t]itle to the land so transferred shall remain in the United States *for use of the Bureau of Indian Affairs*." 64 Stat. 248 (emphasis added).

**{47}** In short, the language of Public Law 567 shows that Congress did not set aside Parcel Three for long-term settlement by an Indian community. By transferring the land simply for "use of the Bureau of Indian Affairs," Congress gave the BIA broad discretion over how to

15

use the land. Such discretion—which apparently extends to transferring a significant portion of Parcel Three to another agency and even to selling part of it to a private individual—is antithetical to long-term settlement by an Indian community and therefore is inconsistent with an intent to create Indian country. To conclude otherwise, we would have to hold that Congress took the unprecedented step of *implicitly* delegating authority to the BIA to create and destroy Indian country on a whim, based on the use that the BIA chooses for Parcel Three at any particular time. Unlike other laws that explicitly delegate authority to create Indian country, the language of Public Law 567 does not support such a conclusion. *Compare* 64 Stat. 248, *with Donnelly*, 228 U.S. at 255-56 (noting that Congress explicitly "confer[red] a discretionary power" on the Executive to set aside lands in California for Indian reservations and to enlarge the boundaries as necessary "for the best interests of the Indians").

**{48}**    And even assuming, arguendo, that Congress intended to give the BIA implicit authority to create Indian country, the BIA's actual use of Parcel Three as the site of the Wingate Schools is inconsistent with long-term settlement by an Indian community. Unlike the Santa Clara Pueblo Indians in *Sandoval* and the inhabitants of the Reno Indian Colony in *McGowan*, no community of Indians, including students or staff of the Wingate Schools, has a right to dwell on or use Parcel Three as the community's homeland, and no Indian community has legal or equitable title to the land in question. Instead, any right to reside on Parcel Three is conditioned upon attendance at or employment with the Wingate Schools and terminates with the end of a student's or employee's tenure.

**{49}**    In the end, the BIA has exercised its discretion under Public Law 567 to use Parcel Three to operate the Wingate Schools, which are federal facilities supported by federal funds that provide a specific, non-exclusive service to Indian children. The provision of such a service, discretionary or otherwise, does not show a congressional designation of federal property as Indian land. *See Venetie*, 522 U.S. at 534 ("Our Indian country precedents . . . do not suggest that the mere provision of 'desperately needed' social programs can support a finding of Indian country."); *see also Quintana*, 2008-NMSC-012, ¶ 7 ("[E]vidence of the practical use of property has never been held to be sufficient to satisfy the set-aside requirement."). *M.C.* summed up this point well:

> BIA schools exist both within and without the boundaries of Indian country. Testimony presented at the hearing established that the purpose of the [Wingate] School and its means of administration are identical to that of all BIA schools, regardless of whether they are located within or without the boundaries of Indian country. There is no evidence that, in any other instance, the presence of a BIA school alone has changed the status of the land on which it is situated. The fact that the School is a BIA school whose purpose is to provide an education to Native American children thus cannot be the defining feature to establish a dependent Indian community on Parcel Three. A holding to the contrary would be an improper expansion of both the language and the historical context of the term dependent Indian community.

311 F. Supp. 2d at 1295-96. We agree. The BIA's operation of a school—even a boarding school on federally owned land—does not by itself create a dependent Indian community. The land must have been set aside for long-term settlement by an Indian community. Because Parcel Three was not set aside for that purpose, it is not a dependent Indian community.

**{50}** Respondents argue that *C.M.G. v. State* supports *Dick*'s conclusion that Parcel Three is a dependent Indian community. 1979 OK CR 39, ¶ 21, 594 P.2d 798, *cert. denied*, 444 U.S. 992 (1979). In *C.M.G.*, the Oklahoma Court of Criminal Appeals held that a BIA-operated school, the Chilocco Indian School, was a dependent Indian community. *See id.* ¶¶ 15-22. Though the result in *C.M.G.* favors Respondents, we agree with the State that the reasoning in that case actually supports our conclusion that Parcel Three is not a dependent Indian community.

**{51}** As Respondents correctly observe, *C.M.G.* noted many features of the Chilocco Indian School that parallel the Wingate Schools in this appeal. *See id.* ¶ 15 (noting that the land is owned by the United States, that all of the students and most of the staff are Indians, and that salaries and tuition are funded by the BIA). However, the Oklahoma Court was clear that it based its holding on language in the Executive Order setting aside the land for the Chilocco Indian School, which provided as follows:

> [T]he following-described tracts of country in the Indian Territory . . . be, and the same are hereby, *reserved and set apart for the settlement of such friendly Indians belonging within the Indian Territory as have been or who may hereafter be educated at the Chilocco Indian Industrial School in said Territory.*

*Id.* ¶ 5 (alteration in original) (quoting 1 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 842 (2d ed. 1904)). Based on this language, the court held that the school was a dependent Indian community because it was on "a tract of land which was *specifically reserved for the settlement of friendly Indians* at the time the Cherokee outlet was ceded to the United States." *Id.* ¶ 21 (emphasis added). This reasoning comports with our conclusion that a dependent Indian community must be located on lands set aside for the long-term settlement of an Indian community. And unlike the Executive Order in *C.M.G.*, Public Law 567 does not reserve or set aside Parcel Three for "settlement" by Indians. We therefore are not troubled by the result in *C.M.G.*

**{52}** We do not mean to diminish the practical reality that the Wingate Schools are indeed a close-knit community, in the commonly understood meaning of the word. As Respondents cogently argue, the Wingate Schools are home to hundreds of Indian children and school employees, and the schools serve as a focal point and gathering place for many aspects of the lives of students, staff, and their families who live on Parcel Three and in the surrounding areas. Again, however, our inquiry is limited to whether Parcel Three was set aside for long-

term settlement by an Indian community—not to whether the BIA, in its discretion, has elected to use the land in a manner that incidentally fosters the development of a community of students, staff, and family members for as long as the BIA permits them to be associated with the schools.

**{53}**     As a final matter, the United States as amicus curiae asserts that there is an "intolerable jurisdictional void" on Parcel Three for law enforcement purposes because of the conflicting rulings in *Dick* and *M.C.* The Navajo Nation, also as amicus curiae, disagrees, arguing that it retains full authority to prosecute all crimes committed by Indians, and that the State may prosecute crimes by non-Indians against other non-Indians and victimless crimes by non-Indians. The Navajo Nation also contends that it has a strong interest in the welfare of the children on the school property.

**{54}**     Whether the United States or the Navajo Nation has jurisdiction over Parcel Three is not before us, and we therefore take no position on either issue. We note, however, that the divergent holdings in the past among the state and federal courts have created confusion and complicated the jurisdictional framework over an area in which hundreds of children, school employees, and their families live and learn. We are mindful of the delicate balance between the various sovereigns and local governments involved, and we are hopeful that they will continue to work together to ensure that Parcel Three remains a safe and healthy environment for all who reside there. We trust that our holding will provide some much-needed clarity, at least with respect to the State's jurisdiction over offenses committed on Parcel Three.

**CONCLUSION**

**{55}**     We overrule *State v. Dick* and hold that Parcel Three is not a dependent Indian community under § 1151. We therefore reverse the district court and the Court of Appeals in both of the cases before us and remand for further proceedings in the district court.

**{56}     IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____

18

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

19